NO. 4-02-0864          Filed 2/26/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|       Plaintiff-Appellee, | ) | Circuit Court of |
|       v. | ) | Champaign County |
| CHARLES SANFORD TERRY, | ) | No. 02CF956 |
|       Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the opinion of the court:

On the night of May 20, 2002, defendant, Charles Sanford Terry, was the front-seat passenger in a pickup truck pulled over by police. A search of defendant at the scene led to immediate arrest and a charge for possession of a controlled substance with intent to deliver (1 gram or more but less than 15 grams of a substance containing cocaine) (720 ILCS 570/401(c)(2) (West 2002)). After an August 2002 bench trial, the trial court convicted defendant of the charge. In September 2002, the court sentenced him to six years in prison.

Defendant appeals, arguing the trial court erred by denying his motion to suppress the evidence against him because (1) police officers (a) exceeded the lawful scope of the traffic stop by asking him if he had any illegal weapons or drugs and (b) unconstitutionally extended his detention beyond the time neces-sary to conduct the traffic stop; and (2) defendant's assuming a

typical search position and saying "You have a job to do" did not constitute consent to search him. We disagree with each contention and affirm.

## I.    BACKGROUND

At the August 2002 hearing on defendant's motion to suppress, Urbana police officer Jay Loschen testified that shortly before 9:30 p.m. on May 20, 2002, he observed a pickup truck in the parking lot of an apartment complex at 808 N. Lincoln in Urbana. In the past, Loschen had made drug arrests at or near 808 N. Lincoln. Loschen parked within sight of the truck and waited for it to leave the parking lot. When he first noticed the truck, its only occupant was the driver, later identified as James Tinnin.

When the truck left the parking lot, defendant was a front-seat passenger. Loschen followed the truck for a half block before pulling it over because the rear registration light was out. Loschen asked Tinnin for his driver's license and proof of insurance. Loschen noticed defendant was not wearing a seat belt and asked defendant for his name and date of birth. Loschen did not see any weapons, drugs, or drug paraphernalia in plain view inside the truck. As Loschen walked back to his squad car to run a computer check on Tinnin and defendant, he called for backup. From the squad car, Loschen saw defendant "ma[k]e several movements in the truck as if he was hiding something."

- 2 -

Specifically, Loschen described defendant as "just bouncing around" with "his hands down by his sides."

Urbana police officer Richard Surles arrived within one minute of Loschen's obtaining Tinnin's license. After the computer check was completed, Loschen and Surles returned to the truck, where Loschen told Tinnin his license was valid and handed it back to him. Surles stood on the passenger side of the truck. Loschen then asked Tinnin if he could speak with him outside the truck. Tinnin agreed and got out of the truck. Loschen told Tinnin the police had several problems with drug sales at 808 N. Lincoln and asked Tinnin for consent to search his truck. Tinnin consented.

During Loschen's conversation with Tinnin, defendant got out of the truck and conversed with Surles. When Loschen finished speaking with Tinnin, Surles was getting ready to place handcuffs on defendant. Surles handed Loschen a small plastic bag containing an off-white, chalky substance he had removed from defendant's jacket pocket. The substance later tested positive for cocaine. Loschen and Surles conducted another search of defendant and Loschen found a small plastic bag containing a white, powdery substance, which also tested positive for cocaine. Loschen acknowledged he suspected drugs would be present when he pulled the truck over because it had been parked at 808 N. Lincoln.

- 3 -

Surles testified when he arrived at the scene, Loschen's squad car was parked behind the truck and Loschen told Surles he was going to try to get consent to search the truck. Both officers walked over to the truck and Surles stood approximately five feet to the rear of the passenger-side door while Loschen spoke with Tinnin. Defendant then got out of the truck. Surles did not ask defendant to get out of the truck or speak with him at all before he got out of the truck. Defendant and Surles exchanged a greeting. Surles then asked defendant if he had any knives, guns, drugs, or needles. Defendant said he did not. Surles then asked defendant if he could search him. Defendant did not respond verbally. Instead, he put his hands on the side of the truck bed and kicked his legs back into the position in which one would be searched. Surles again asked defendant if he could search him. Defendant said, "'You got to go ahead and do what you got to do.'" Surles asked again if that meant he could search defendant. Defendant replied, "'you have a job to do'" and "'here[,] let me help you out.'" He then removed some items from his jacket pocket and put them on the edge of the truck, including a cellular phone, a lighter, and some medication. Defendant put his hands back on the truck and Surles began to pat him down. Surles believed he had consent to search defendant at that time based on defendant's statements, body language, demeanor, and the fact he voluntarily removed items

from his jacket.

In defendant's right jacket pocket, Surles found a plastic bag containing a large piece of crack cocaine. Upon the discovery, defendant said, "possession," and Surles handcuffed him. After he was placed under arrest, Surles found a bag of powdered cocaine in a "cargo pocket" of defendant's pants.

Surles acknowledged nothing about the traffic stop made him fear for his safety beyond his ususal sense of caution. Loschen did not tell Surles why he wanted to search the truck, what his suspicions were, or what those suspicions were based upon. Surles did not see any weapons, drugs, or paraphernalia in plain view. Nothing about defendant caused Surles to have an "elevated level of caution." His basis for asking defendant for consent to be searched was because Loschen was asking for consent to search the truck. It was not a weapons pat down. It was a search. Surles did not know defendant before this incident.

Although the testimony of defendant's witnesses differed from that of Loschen and Surles, particularly regarding defendant's interaction with Surles, the trial court found the officers' testimony credible, and defendant does not challenge the court's factual findings. We need not include a recitation of defendant's evidence.

At the conclusion of the suppression hearing, the trial court denied defendant's motion to suppress the evidence.

Following an August 2002 bench trial, the court convicted defendant of possession of a controlled substance with intent to deliver (720 ILCS 570/401(c)(2) (West 2002)) and sentenced him to six years in prison. This appeal followed.

On July 8, 2004, this court issued an order reversing the trial court's judgment based on our conclusion the trial court erred in denying defendant's motion to suppress. People v. Terry, No. 4-02-0864 (July 8, 2004) (unpublished order under Supreme Court Rule 23). On August 12, 2004 the State filed a petition for leave to appeal with the Supreme Court of Illinois. The supreme court issued a supervisory order on denial of the petition for leave to appeal:

"In the exercise of this court's supervisory authority, the Appellate Court, Fourth District, is directed to vacate its judgment in People v. Terry, No. 4-02-0864 (July 8, 2004). The appellate court is directed to reconsider its judgment in light of Illinois v. Caballes, 543 U.S. 405 [,160 L. Ed. 2d 842, 125 S. Ct. 834] (2005), and People v. Caballes, 221 Ill. 2d 282 [,851 N.E.2d 26] (2006) (opinion on remand)." People v. Terry, 221 Ill. 2d 668, 853 N.E.2d 1230 (2006) (nonprecedential supervisory order on

- 6 -

denial of leave to appeal).

Pursuant to the supreme court's supervisory order, we now reconsider this case in light of those two Caballes decisions.

## II. DENIAL OF DEFENDANT'S MOTION TO SUPPRESS

Defendant argues the trial court erred by denying his motion to suppress evidence because his fourth-amendment rights were violated when Surles expanded the scope of the traffic stop by asking defendant if he had any knives, guns, drugs, or needles. We disagree.

### A. Standard of Review

Reviewing a trial court's ruling on a motion to suppress involves mixed questions of fact and law. People v. Gherna, 203 Ill. 2d 165, 175, 784 N.E.2d 799, 805 (2003). On review, we give great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. Gherna, 203 Ill. 2d at 175, 784 N.E.2d at 805. However, we review the trial court's legal determination of whether suppression is warranted under those facts de novo. Gherna, 203 Ill. 2d at 175, 784 N.E.2d at 805. Defendant does not argue the trial court's factual determinations are against the manifest weight of the evidence. Thus, we accept those determinations and address de novo defendant's legal challenge.

### B. The Traffic Stop

Defendant contends the trial court erred by denying his motion to suppress evidence because Surles violated his constitutional right against unreasonable searches and seizures (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6) when he turned the traffic stop into a drug investigation by asking defendant if he had any knives, guns, drugs, or needles. We disagree.

In People v. Caballes, 207 Ill. 2d 504, 506, 802 N.E.2d 202, 203 (2003) (hereinafter Caballes I), the defendant was lawfully stopped for speeding. The trooper had no reasonable suspicion the defendant's car contained contraband. While the trooper was writing the traffic ticket, a second trooper arrived with a drug-detection dog. Caballes I, 207 Ill. 2d at 507, 802 N.E.2d at 203. Following a walk around, the dog alerted to the trunk and marijuana was discovered. Caballes I, 207 Ill. 2d at 507, 802 N.E.2d at 203. The trial court denied the defendant's motion to suppress and found the defendant guilty, and the appellate court affirmed. Caballes I, 207 Ill. 2d at 508, 802 N.E.2d at 203.

On appeal, the Illinois Supreme Court found the State failed to justify using the canine sniff. Caballes I, 207 Ill. 2d at 509, 802 N.E.2d at 204. The court noted the officers did not detect an odor of marijuana or observe evidence suggesting the presence of illegal drugs. Caballes I, 207 Ill. 2d at 509, 802 N.E.2d at 204. Even though the second trooper brought the

dog on his own volition, the court found "the police impermissibly broadened the scope of the traffic stop in this case into a drug investigation because there were no specific and articulable facts to support the use of a canine sniff." Caballes I, 207 Ill. 2d at 509, 802 N.E.2d at 204.

On appeal to the United States Supreme Court, the issue centered on whether the fourth amendment required reasonable, articulable suspicion to justify using a drug-detection dog to sniff the exterior of a vehicle during a legitimate traffic stop. Caballes, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837 (hereinafter Caballes II). Finding the initial seizure lawful, the Court noted a stop for the issuance of a traffic violation could "become unlawful if it [were] prolonged beyond the time reasonably required to complete that mission." Caballes II, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837. The Court found the state-court proceedings indicated the stop lasted less than 10 minutes and accepted the state court's conclusion the length of the stop was justified by the traffic violation "and the ordinary inquiries incident to such a stop." Caballes II, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837.

The Supreme Court went on to state official conduct does not constitute a search under the fourth amendment unless it compromises a legitimate privacy interest. Caballes II, 543 U.S.

at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837.  Because a person's interest in possessing contraband cannot be deemed legitimate, official conduct that merely reveals the possession of contraband does not compromise a legitimate privacy interest. Caballes II, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837.  The Supreme Court concluded "the use of a well-trained narcotics-detection dog--one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' [citation]--during a lawful traffic stop, generally does not implicate legitimate privacy interests."  Caballes II, 543 U.S. at 409, 160 L. Ed. 2d at 847, 125 S. Ct. at 838.

Upon remand after the Supreme Court vacated Caballes I, the Illinois Supreme Court found "the dog sniff of a vehicle does not constitute an invasion of privacy."  People v. Caballes, 221 Ill. 2d 282, 331, 851 N.E.2d  26, 55 (2006) (hereinafter Caballes III).  The supreme court adhered to the limited lockstep approach and declined to hold the search-and-seizure clause of the Illinois Constitution provided greater protection than the fourth amendment.  Caballes III, 221 Ill. 2d at 335-36, 851 N.E.2d at 57.  The court concluded evidence obtained as a result of the dog sniff was properly admitted at the defendant's trial and affirmed his conviction.  Caballes III, 221 Ill. 2d at 336, 851 N.E.2d at 57.

In People v. Gonzalez, 204 Ill. 2d 220, 235, 789 N.E.2d

260, 270 (2003), abrogated on other grounds by People v. Luedemann, 222 Ill. 2d 530, 548, 857 N.E.2d 187, 199 (2006), the Illinois Supreme Court provided an analysis for determining whether police conduct during the course of a traffic stop satisfies the scope requirement of Terry v. Ohio, 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1879-80 (1968). That is, was the police officer's questioning of the defendant related in scope to the circumstances that justified the stop. There is a growing trend in the case law that concludes the scope requirement adopted from Terry and enunciated in Gonzalez is no longer good law. See People v. Driggers, 222 Ill. 2d 65, 72, 853 N.E.2d 414, 418 (2006) (police action that does not unreasonably prolong a lawful traffic stop or independently trigger fourth-amendment concerns is not prohibited merely because it changed the character of the stop); People v. Starnes, 374 Ill. App. 3d 329, 334, 871 N.E.2d 815, 820 (2007) (Second District: decisions after Caballes III have recognized the Gonzalez scope requirement is no longer viable); People v. Roberson, 367 Ill. App. 3d 193, 201, 854 N.E.2d 317, 324 (2006) (Fourth District: applying the logic of Caballes II, a warrant check on a passenger would only change the fundamental nature of the stop if it caused the seizure to last longer than required for such a traffic stop or if it infringed upon the passenger's legitimate interest in privacy); People v. Conner, 358 Ill. App. 3d 945, 961-62, 832

- 11 -

N.E.2d 442, 456-57 (2005) (First District:  citing <u>Caballes II</u> and <u>Muehler v. Mena</u>, 544 U.S. 93, 101, 161 L. Ed. 2d 299, 309, 125 S. Ct. 1465, 1471 (2005)); see also <u>People v. Starbuck</u>, 358 Ill. App. 3d 234, 239, 831 N.E.2d 636, 641 (2005) (Third District) (Schmidt, J., specially concurring) (the United States Supreme Court has made it "abundantly clear that it has rejected the notion that questioning, including requests for consent to search, must be related to the initial purpose for the police contact" and to the extent <u>Gonzalez</u> and other decisions hold to the contrary, they are no longer good law).  In <u>Starnes</u>, 374 Ill. App. 3d at 334, 871 N.E.2d at 820, the Second District noted the Illinois Supreme Court in <u>Caballes III</u>

> "acquiesced in the [United States] Supreme
> Court's holding that, if a traffic stop is
> proper, police action that does not unreason-
> ably prolong the stop or independently trig-
> ger the fourth amendment is permissible even
> if it goes beyond the scope of the stop.  The
> court unmistakably, albeit not explicitly,
> abandoned the scope requirement of the <u>Gonza-
> lez</u> test."

Applying the logic of <u>Caballes II</u> and <u>III</u>, questioning defendant passenger here changes the fundamental nature of the traffic stop only if "(1) it causes the seizure to last longer

than the time reasonably required for such a traffic stop or (2) it infringes upon the passenger's legitimate interest in privacy." Roberson, 367 Ill. App. 3d at 201, 854 N.E.2d at 324. In our initial decision in this case, we found "no evidence showed that Surles' questioning of defendant unreasonably prolonged defendant's detention." Terry, slip order at 10. We will not revisit that conclusion.

On the issue of a legitimate privacy interest, Surles asked defendant if he had any knives, guns, drugs, or needles on him. In this case, this question is the equivalent of asking defendant whether he possessed items of contraband. Posing the question does not "'compromise any legitimate interest in privacy'" because "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interest.'" (Emphasis in original.) Caballes II, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837, quoting United States v. Jacobsen, 466 U.S. 109, 123, 80 L. Ed. 2d 85, 100-01, 104 S. Ct. 1652, 1661-62 (1984). Surles did not violate defendant's privacy rights under the fourth amendment by asking him whether he had any knives, guns, drugs, or needles.

### C. Consent To Search

We also conclude defendant's conduct evinced his consent to a search of his person. The fourth amendment guaran-

- 13 -

tees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Article I, section six, of the Illinois Constitution also protects individuals from unreasonable searches and seizures. Ill. Const. 1970, art. I, §6. Our supreme court has interpreted the search-and-seizure clause of the Illinois Constitution in a manner consistent with the United States Supreme Court's fourth-amendment jurisprudence. People v. Anthony, 198 Ill. 2d 194, 201, 761 N.E.2d 1188, 1192 (2001).

Generally, reasonableness in the fourth-amendment context requires a warrant supported by probable cause. Katz v. United States, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514 (1967). However, a warrantless search does not violate the fourth amendment if it is conducted pursuant to the voluntary consent of the person whose person or property is searched. Illinois v. Rodriguez, 497 U.S. 177, 181, 111 L. Ed. 2d 148, 156, 110 S. Ct. 2793, 2797 (1990), citing Schneckloth v. Bustamonte, 412 U.S. 218, 219, 36 L. Ed. 2d 854, 858, 93 S. Ct. 2041, 2043-44 (1973); see also People v. Smith, 214 Ill. 2d 338, 349, 827 N.E.2d 444, 451-52 (2005) (individual's voluntary consent eliminates the need for probable cause and a warrant), abrogated on other grounds by Luedemann, 222 Ill. 2d at 548, 857 N.E.2d at 199.

A defendant's consent is invalid "unless it is voluntary, and, to be voluntary, consent must be given freely without duress or coercion (either express or implied)."  People v. Green, 358 Ill. App. 3d 456, 462, 832 N.E.2d 465, 471 (2005).

> "Consent must be received, not extracted 'by explicit or implicit means, by implied threat or covert force.'  Schneckloth, 412 U.S. at 228, 36 L. Ed. 2d at 863, 93 S. Ct. at 2048.  'In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.'  Schneckloth, 412 U.S. at 229, 36 L. Ed. 2d at 864, 93 S. Ct. at 2049.  The voluntariness of the consent is a question of fact determined from the totality of the circumstances, and the State bears the burden of proving the consent was truly voluntary."  Anthony, 198 Ill. 2d at 202, 761 N.E.2d at 1192.

In Anthony, 198 Ill. 2d at 197-98, 761 N.E.2d at 1190, a police officer approached the defendant in an alley and, after asking him what he was doing in the area and whether he had

- 15 -

anything on him that could hurt the officer or his partner, requested his consent to a search of his person.  The defendant, nervous and with hands shaking, gave no verbal consent but merely "assumed the position" for a pat down by spreading his legs apart and placing his hands on top of his head.  Anthony, 198 Ill. 2d at 198, 761 N.E.2d at 1190.  The officer construed the defendant's actions as "nonverbal consent," searched him, and found cocaine.  Anthony, 198 Ill. 2d at 198-99, 761 N.E.2d at 1190.

The supreme court found the State failed to prove the defendant had voluntarily consented to the search.  Anthony, 198 Ill. 2d at 203-04, 761 N.E.2d at 1193.  The court stated, in part, as follows:

> "The defendant may convey consent to search by nonverbal conduct [citations], but 'mere acquiescence to apparent authority is not necessarily consent' [citation]. ***
>
> ***
>
> The State would have us draw an inference *** that the defendant intended to consent, not acquiesce.  An equally valid inference from the defendant's ambiguous gesture is that he submitted and surrendered to what he viewed as the intimidating presence of an armed and uniformed police officer who had

- 16 -

just asked a series of subtly and increasingly accusatory questions." Anthony, 198 Ill. 2d at 202-03, 761 N.E.2d at 1192-93, quoting People v. Kelly, 76 Ill. App. 3d 80, 87, 394 N.E.2d 739, 744 (1979).

In this case, defendant's actions constituted more than simply "assuming the position". His verbal and nonverbal conduct indicated his consent was voluntary. After Surles asked defendant if he could search him, defendant placed his hands on the truck and kicked his legs back and spread them in the search position. This conduct could be an ambiguous gesture subject to dual inferences. However, there was not a single, ambiguous act here.

After defendant assumed the position against the truck, Surles again asked if he could search him. Defendant responded, "'You got to go ahead and do what you got to do.'" Surles sought clarification by asking, "Does that mean I can search you[?]" Defendant responded, "'You have a job to do.'" Thereafter, defendant said, "'here[,] let me help you out.'" He then removed items from his coat and placed them on the truck. Defendant again put his hands back up on the truck. Believing he received the consent he needed, Surles began searching defendant.

The record supports the conclusion defendant consented to be searched and Officer Surles was objectively reasonable in

believing defendant consented.  This was not a situation where the police extracted defendant's consent by explicit or implicit means or with threats, intimidation, or force.  No credible evidence indicated Surles asked a series of accusatory questions or used his authority to get defendant to acquiesce and give his consent to search.  Defendant's conduct was not merely a shrug, as in People v. Raibley, 338 Ill. App. 3d 692, 700-02, 788 N.E.2d 1221, 1229-30 (2003), or an ambiguous assumption of the position, as in Anthony.  Instead, defendant's words and conduct evinced his voluntary consent to search.

### III. CONCLUSION

The traffic stop was lawful.  The questioning of defendant was constitutionally permissible.  The defendant's consent was voluntary.  The trial court's denial of defendant's motion to suppress was not against the manifest weight of the evidence.

Accordingly, we affirm the trial court's judgment.  As part of our judgment, we grant the State its $50 statutory assessment against defendant as costs of this appeal.

Affirmed.

APPLETON, P.J., and TURNER, J., concur.