NO. 4-10-0297    Opinion Filed 2/16/11

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Macon County |
| ABBY G. McQUOWN, | ) | No. 09CF1255 |
| Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Timothy J. Steadman, |
| | ) | Judge Presiding. |

_____

JUSTICE TURNER delivered the judgment of the court, with opinion.

Presiding Justice Knecht and Justice Pope concurred in the judgment and opinion.

**OPINION**

In August 2009, the State charged defendant, Abby G. McQuown, with the offenses of unlawful possession of a controlled substance with intent to deliver, unlawful possession of a controlled substance, and unlawful possession of cannabis.  In October 2009, defendant filed a motion to suppress evidence, which the trial court granted.

On appeal, the State argues the trial court erred in granting the motion to suppress.  We affirm.

I. BACKGROUND

In August 2009, the State charged defendant with three drug-related offenses.  In count I, the State charged her with the offense of unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(B) (West 2008)), alleging she knowingly and unlawfully possessed with intent to

deliver 100 grams or more but less than 400 grams of a substance containing cocaine. In count II, the State charged her with the offense of unlawful possession of a controlled substance (720 ILCS 570/402(a)(2)(B) (West 2008)), alleging she knowingly and unlawfully had in her possession 100 grams or more but less than 400 grams of a substance containing cocaine. In count III, the State charged her with the offense of unlawful possession of cannabis (720 ILCS 550/4(b) (West 2008)), alleging she knowingly and unlawfully had in her possession more than 2.5 grams but less than 10 grams of a substance containing cannabis. Defendant pleaded not guilty.

In October 2009, defendant filed a motion to suppress evidence. Defendant alleged she was pulled over on Interstate 72 for having an obstructed view. After issuing her a written warning, Officer Chad Larner continued questioning her. Defendant declined the officer's request to consent, and the officer told her she would have to wait for the canine unit to arrive. Defendant claimed her arrest was unlawful and the contraband found in her vehicle should be suppressed.

In March 2010, the trial court conducted a hearing on the motion to suppress. Defendant testified she was pulled over on Interstate 72 at approximately 3 p.m. on August 10, 2009. The police officer approached from the passenger side and asked for her driver's license, registration, and proof of insurance. The officer indicated defendant had been stopped for having an obstructed windshield based on air fresheners hanging on the

rearview mirror.  After taking her documents, the officer asked her to step out of her car.  He then gave her a warning citation, which indicated it was completed at 3:12 p.m.  Thereafter, the officer asked for permission to search the vehicle "quite a few times," but defendant declined.  Defendant stated a second officer arrived "probably 30 minutes later."  She also stated a canine unit arrived 15 to 20 minutes later.  She estimated the traffic stop had taken "at least 45 minutes" before the canine unit arrived.

On cross-examination, defendant testified she had three air fresheners hanging from the rearview mirror.  She also had a spray air freshener in the car.

Decatur police officer Chad Larner testified he was conducting patrol operations on Interstate 72 in Macon County on August 10, 2009.  Larner initiated a traffic stop for an obstructed windshield and asked defendant for her driver's license and proof of insurance.  He then issued her a written warning citation, which indicated the arrival time as being 3:01 p.m. and the time of completion as 3:12 p.m.  After giving defendant a copy of the warning, Larner requested permission to search the car.  Defendant refused.  At approximately 3:25 p.m., Larner requested other officers to come to the scene.  Larner testified the canine unit arrived on the scene less than 30 minutes after the stop occurred.

On cross-examination, Officer Larner testified he initially decided to follow defendant's car after noticing the

obstructed windshield caused by objects suspended from the rearview mirror.  Thereafter, defendant made "an exaggerated lane change" without using a turn signal.  When Larner pulled up alongside her, defendant's car "quickly decreased" its speed down to approximately 43 miles per hour, "which is a couple of miles below the posted minimum speed."  Larner stated he could see defendant "staring" at him in her rearview mirror.  When he pulled up alongside her, "she refused to make eye contact" with him.  He found this behavior inconsistent "with the general motoring public."  Larner also said defendant "ran her fingers through her hair pretty frequently," which he characterized as a "grooming gesture" that could be an indicator of nervous behavior.

After stopping defendant's car, Officer Larner approached the passenger side.  When defendant rolled down the window, Larner stated he was "greeted with the overwhelming smell of an artificial air freshener."  He stated the scent was vanilla.  He noticed at least three air fresheners hanging down from the rearview mirror.  Larner also saw air fresheners "suspended from the turn signal" and clipped to the air vents.  A large spray bottle of air freshener rested on the front passenger seat.  Larner stated drug traffickers often try to overwhelm the vehicle's interior with an artificial air freshener to prevent a drug canine from detecting the odor of contraband.

Officer Larner asked defendant if she liked the smell of vanilla, but she responded in the negative.  When defendant

handed over her driver's license and proof of insurance, Larner noticed her "right hand and arm were significantly trembling and shaking." While a certain level of nervousness is expected during a traffic stop, Larner stated defendant's nervousness did not subside but "increasingly grew during the course of the stop." Larner took the documents back to his squad car.

After preparing a written warning, Officer Larner returned to defendant's car and asked her to step out to the front of his car. Larner asked her where she was coming from, and defendant responded Danville. When asked why she was traveling to Decatur, defendant stated she was going "to visit a friend named Tommy." She did not know where Tommy lived but stated she was supposed to call him when she arrived. Larner stated his suspicions were growing at this time. During this conversation, Larner noticed defendant looking back over her shoulder several times toward her vehicle. This also increased Larner's suspicions as people transporting contraband are "very concerned" about their vehicle. Larner also stated defendant "had a very difficult time standing still." She even stated she was "cold." Larner estimated the asphalt to be 115°F on that "very hot summer day."

Larner then asked defendant to sign the written warning. When Larner handed her the clipboard, he noticed she was "trembling and shaking." She then asked if she could sit in his squad car to sign the warning, which she did. After signing the warning, Larner asked defendant for consent to search her car.

She refused.  He stated he asked for consent because "it's more convenient" than waiting for another officer to arrive at the scene.  Larner then showed her a permission-to-search form. Defendant requested to use the phone in her car, and Larner allowed her to do so.  She entered her car, retrieved her phone, and made a call.

At that point, Larner requested a canine unit to come to the scene.  Once the unit arrived, and with defendant standing behind Larner's vehicle, the dog alerted on her car.  A search of the car revealed cocaine located beneath the driver's seat.

On redirect examination, Officer Larner estimated he requested a second officer and a canine unit at around 3:25 p.m. Officer Dailey arrived within 2 to 3 minutes, and the canine unit arrived within 10 to 15 minutes.

Following arguments on the motion, the trial court made oral findings.  The court found Officer Larner's testimony was credible and probable cause existed for the traffic stop.  The court also found the stop occurred at 3:01 p.m., the warning ticket was issued at 3:12 p.m., and the canine unit arrived at approximately 3:50 p.m.  After taking the matter under advisement, the court issued a written order, stating, in part, as follows:

> "There were, generally, no facts which
> surfaced at the time of the stop or during
> the detention that would lead to a reasonable
> belief that the defendant was involved in

more serious crimes than routine traffic offenses.  Facts which may arguably have led to such a belief are: (1) that the defendant's vehicle smelled strongly of air freshener and (2) that there were three air fresheners hanging from the rearview mirror, a bottle of air freshener on the front passenger seat, and air fresheners affixed to the air vents located inside the vehicle.  These facts must be considered in light of Officer Larner's training suggesting that drug traffickers sometimes attempt to mask the odor of drug contraband through the use of scents emitted from air fresheners.

The fact that the presence of, and odor from, air fresheners may constitute reasonable suspicion of criminal activity beyond that of traffic violations does not conclusively resolve the matter.  The State bears the burden of showing that a seizure based on reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.  [Citations.]  In the case at bar, the officer detected the overwhelming odor of air freshener, and the presence of air fresheners in

the defendant's vehicle almost immediately after effecting the traffic stop.  Despite these observations, several minutes passed before the canine unit was summoned to the scene.  As mentioned previously, the canine unit did not arrive until 37 or 38 minutes after the warning citation was issued.  Under these facts, the court finds that the State has failed to meet its burden in showing that the seizure of the defendant was sufficiently limited in duration."

The court granted the motion to suppress.  In April 2010, the State filed a certificate of impairment.  This appeal followed.

## II. ANALYSIS

The State argues the trial court erred in granting defendant's motion to suppress as Officer Larner had reasonable suspicion to detain her car for a canine sniff.  We disagree.

### A. Standard of Review and Burden of Proof

In reviewing a motion to suppress on appeal, we are presented with mixed questions of law and fact.  *People v. Terry*, 379 Ill. App. 3d 288, 292, 883 N.E.2d 716, 720 (2008).  "[The] trial court's findings of historical fact are reviewed for clear error, giving due weight to any inferences drawn from those facts by the [court]."  *People v. Harris*, 228 Ill. 2d 222, 230, 886 N.E.2d 947, 953 (2008).  Great deference is accorded a trial court's factual findings, and those findings will be reversed

only if against the manifest weight of the evidence. *People v. Cosby*, 231 Ill. 2d 262, 270-71, 898 N.E.2d 603, 609 (2008) (quoting *People v. Luedemann*, 222 Ill. 2d 530, 542, 857 N.E.2d 187, 195 (2006)).

"A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted." *Luedemann*, 222 Ill. 2d at 542, 857 N.E.2d at 195. Thus, we review the trial court's ultimate ruling as to whether suppression was warranted *de novo*. *People v. Oliver*, 236 Ill. 2d 448, 454, 925 N.E.2d 1107, 1110 (2010).

On a motion to suppress evidence, the defendant has the burden of proving the search and seizure were unlawful. 725 ILCS 5/114-12(b) (West 2008); *People v. Barker*, 369 Ill. App. 3d 670, 673, 867 N.E.2d 1021, 1023 (2007). "'However, once the defendant makes a *prima facie* showing of an illegal search and seizure, the burden shifts to the State to produce evidence justifying the intrusion.'" *People v. Reatherford*, 345 Ill. App. 3d 327, 334, 802 N.E.2d 340, 347-48 (2003) (quoting *People v. Ortiz*, 317 Ill. App. 3d 212, 220, 738 N.E.2d 1011, 1018 (2000)).

## B. The Fourth Amendment

The fourth amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, the Illinois Constitution affords citizens with "the right to be

secure in their persons, houses, papers[,] and other possessions against unreasonable searches[] [and] seizures." Ill. Const. 1970, art. I, §6. Our supreme court has interpreted the search-and-seizure clause of the Illinois Constitution in a manner consistent with the United States Supreme Court's fourth-amendment jurisprudence. See *People v. Caballes*, 221 Ill. 2d 282, 335-36, 851 N.E.2d 26, 57 (2006).

"When a police officer observes a driver commit a traffic violation, the officer is justified in briefly detaining the driver to investigate the violation." *People v. Ramsey*, 362 Ill. App. 3d 610, 614, 839 N.E.2d 1093, 1097 (2005). A stop of a vehicle and the detention of its occupants constitutes a "seizure" under the fourth amendment. *People v. Jones*, 215 Ill. 2d 261, 270, 830 N.E.2d 541, 549 (2005). To be constitutionally permissible, a vehicle stop must be reasonable under the circumstances, and the stop will be deemed reasonable "'where the police have probable cause to believe that a traffic violation has occurred.'" *Ramsey*, 362 Ill. App. 3d at 615, 839 N.E.2d at 1098 (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)).

In the case *sub judice*, Officer Larner initiated a traffic stop after observing defendant driving a vehicle with an obstructed windshield. It is a violation of the Illinois Vehicle Code to "drive a motor vehicle with any objects placed or suspended between the driver and the front windshield *** which materially obstructs the driver's view." 625 ILCS 5/12-503(c) (West 2008). Thus, Officer Larner had probable cause to initiate

a valid traffic stop here.

In analyzing the conduct of police officers during a lawful traffic stop, our supreme court has looked to the United States Supreme Court's decision in *Illinois v. Caballes*, 543 U.S. 405 (2005). *Harris*, 228 Ill. 2d at 239, 886 N.E.2d at 958.

> "First, a seizure that is lawful at its inception can become unlawful 'if it is prolonged beyond the time reasonably required' to complete the purpose of the stop. *Caballes*, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837. Second, so long as the traffic stop is 'otherwise executed in a reasonable manner,' police conduct does 'not change the character' of the stop unless the conduct itself infringes upon the seized individual's 'constitutionally protected interest in privacy.' *Caballes*, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837." *Harris*, 228 Ill. 2d at 239, 886 N.E.2d at 958-59.

"Thus, police conduct occurring during an otherwise lawful seizure does not render the seizure unlawful unless it either unreasonably prolongs the duration of the detention or independently triggers the fourth amendment." *People v. Baldwin*, 388 Ill. App. 3d 1028, 1033, 904 N.E.2d 1193, 1198 (2009).

The central issue in this case revolves around the

- 11 -

duration principle. In looking at the length of the stop, no bright-line rule has been adopted to indicate when a stop has been unreasonably prolonged. *Baldwin*, 388 Ill. App. 3d at 1034, 904 N.E.2d at 1199. Instead, the duration of the stop must be justified by the nature of the offense and "the ordinary inquiries incident to such a stop." *Caballes*, 543 U.S. at 408; *People v. Driggers*, 222 Ill. 2d 65, 73, 853 N.E.2d 414, 419 (2006); *People v. Koutsakis*, 272 Ill. App. 3d 159, 164, 649 N.E.2d 605, 609 (1995) ("Courts must consider the purpose to be served by the stop as well as the time reasonably needed to effectuate those purposes."). Courts "employ a contextual, totality of the circumstances analysis that includes consideration of the brevity of the stop and whether the police acted diligently during the stop." *Baldwin*, 388 Ill. App. 3d at 1034, 904 N.E.2d at 1199.

In this case, Officer Larner stopped defendant's vehicle after observing an obstructed windshield. The trial court found the stop occurred at 3:01 p.m., as noted on the written warning. After asking defendant for her driver's license and proof of insurance, Larner completed the warning citation at 3:12 p.m. Defendant signed the citation, but nothing indicates Officer Larner returned her driver's license and proof of insurance with the citation. Between 3:12 p.m. and 3:25 p.m., Larner requested permission to search, but defendant refused. He called for the canine unit at 3:25 p.m. and it arrived at approximately 3:50 p.m.

We hold the traffic stop was unduly prolonged in this

case.  The "business portion" of the stop took a little over 10 minutes, but Officer Larner did not ask for a canine unit until 13 minutes after the initial purpose of the stop had ended.  Then, the canine unit did not arrive until 25 minutes later.  See *Baldwin*, 388 Ill. App. 3d at 1035, 904 N.E.2d at 1199 (finding 14-minute stop was unreasonably prolonged when the initial purpose of the stop concluded after 4.5 minutes); *People v. Ruffin*, 315 Ill. App. 3d 744, 749-50, 734 N.E.2d 507, 511 (2000) (finding the 22-minute stop was unreasonably prolonged when the business portion took only 10 minutes).  Thus, the duration of the detention was prolonged beyond the time reasonably required to complete the traffic stop.

The State, however, argues the evidence justified Officer Larner's reasonable suspicion that defendant's vehicle contained contraband, thereby allowing for further detention to await the canine unit.  The State points out the overwhelming smell of vanilla air freshener, defendant's nervousness, her inability to state exactly where she was heading, her frequent looks back to her vehicle, and the fact that Interstate 72 is known as a drug corridor.

> "'The State bears the burden of showing that a seizure based on reasonable suspicion was sufficiently limited in scope and duration' [citation], and 'in assessing whether a detention is too long in duration to be justified as an investigatory stop, we must

- 13 -

consider whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.' [Citations.]" *People v. O'Dell*, 392 Ill. App. 3d 979, 986, 913 N.E.2d 107, 113 (2009).

Here, the bulk of the factors supporting Officer Larner's reasonable suspicion were known early on in the stop. He smelled the abundance of air freshener as soon as defendant rolled down her window. Three air fresheners were hanging down from the rearview mirror and more were suspended from the turn signal and clipped to the air vents. A large spray bottle of air freshener rested on the front passenger seat. Larner also noticed defendant was shaking and trembling when she handed over her driver's license and proof of insurance. Yet Larner did not request a canine unit. After he filled out the warning citation, Larner asked defendant where she was going. She stated she was going to meet with Tommy but was not sure where he lived. Defendant also stated she was cold on that hot summer day and kept looking back over her shoulder at her car. After asking defendant to sign the citation, Larner stated she was "trembling and shaking" in trying to do so. Still, Larner did not call for the canine unit. Instead, he attempted to obtain defendant's consent for approximately the next 13 minutes. It was only after that length of time that Larner called for the canine unit, and even then, the unit did not arrive for another 25 minutes or so.

The length of the stop was unreasonable in this case, and the trial court did not err in granting the motion to suppress.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.