969 N.E.2d 383 (2012)
360 Ill. Dec. 573
The PEOPLE of the State of Illinois, Plaintiff-Appellant,
v.
Stanley WOFFORD, Defendant-Appellee.
No. 5-10-0138.
Appellate Court of Illinois, Fifth District.
Ruled 23 Filed March 5, 2012.
Rehearing Denied May 8, 2012.
Motion to Publish Granted May 9, 2012.
*385 Edward C. Deters, State's Attorney, Effingham (Patrick Delfino, Director, Stephen E. Norris, Deputy Director, Rebecca E. McCormick, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, of counsel), for the People.
Stanley Wofford, Effingham, appellee pro se.

OPINION
Justice STEWART delivered the judgment of the court, with opinion.
¶ 1 The defendant, Stanley Wofford, was charged with unlawful possession of a weapon by a felon, possession of a weapon with a defaced serial number, and unlawful possession with intent to deliver a controlled substance. He filed a motion to suppress evidence and statements, which the court granted on March 16, 2010. The State filed a certificate of substantial impairment and a timely notice of appeal. We reverse and remand.

¶ 2 BACKGROUND
¶ 3 The evidence introduced at the hearing on the motion to suppress can be summarized as follows. On October 16, 2009, Trooper Mark Flack, who had been an Illinois State Police officer for over nine years and a canine handler for two years, was on patrol in his squad car. His canine, Rohdee, was riding in the squad car with him, in a kennel in the backseat. While traveling southbound on Interstate 57, Trooper Flack noticed a green Nissan automobile that he believed was committing a "fatal five violation" by following too closely behind a camper trailer. He explained that a fatal five violation is one the Illinois State Police have determined to be one of the top five traffic violations leading to fatal crashes. When Trooper Flack first noticed the Nissan, he was in the left *386 lane several hundred feet behind the Nissan, which was in the right lane behind a camper trailer.
¶ 4 Trooper Flack explained that he determined that the Nissan, a compact car, was following the camper trailer at less than a one-second interval by using the dotted lines on the highway as a reference point. He stated that he chose a dotted line, and when the front vehicle, the camper trailer, reached that dotted line, he began "counting one thousand one, one thousand two." He typically performs this test several times. Trooper Flack noted that he does not try to measure the distance between the vehicles but only the time interval based on his use of a single dotted line as a reference point. He explained that he begins counting when the rear of the lead vehicle reaches the dotted line and stops when the front of the following vehicle reaches that point.
¶ 5 After observing the two vehicles, Trooper Flack concluded that the Nissan was following the camper trailer at less than a one-second interval, which is less than the two-second interval recommended by the Illinois Rules of the Road. He follows the guideline of the Rules of the Road because the statute that prohibits following too closely specifies only that a driver should not follow closer than what is reasonable or prudent, which "leaves it open to interpretation." See 625 ILCS 5/11-710(a) (West 2008) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.").
¶ 6 Trooper Flack decided to initiate the traffic stop after observing the Nissan traveling well over a half mile at a less than one-second interval behind the camper trailer. He noted that the camper trailer was wider than most other vehicles, which made it more difficult for its driver to see other vehicles in the rear-view or side-view mirrors, especially those following too closely behind. After he decided to stop the Nissan, he called in the traffic stop to his dispatcher and then activated the overhead lights on his squad car. He testified that the camera in his squad car runs continuously, but, when he activates his overhead lights, that initiates the digital recording, which actually begins approximately one minute before the lights are activated. The defendant introduced the digital recording of the traffic stop into evidence for the court's review.
¶ 7 The recording shows Trooper Flack in his squad car in the left lane of the interstate and the vehicle the defendant was driving in the right lane directly behind a camper trailer. At one minute and eight seconds into the tape, Trooper Flack activated the overhead lights on his squad car, and the Nissan began to pull onto the shoulder of the highway. When the Nissan completed its stop, Trooper Flack exited the squad car and talked to the defendant through the passenger window of the vehicle. The defendant did not have any passengers in his car. Trooper Flack told the defendant that he had been following too closely behind the camper trailer, which is a fatal five violation, and that he intended to give the defendant a warning ticket. He testified that he noticed that the defendant's eyes were red and glassy but did not see any weapons or anything else that would pose a threat inside the car. He did not smell cannabis and did not see any open alcohol containers, illegal drugs, or drug paraphernalia. Trooper Flack asked the defendant for his driver's license, registration, and proof of insurance, and he asked the defendant to get out of his car and sit in the front seat of the squad car while he gathered the defendant's information and wrote the warning *387 ticket. The defendant exited his car about 3½ minutes after the beginning of the digital recording.
¶ 8 While Trooper Flack was checking the defendant's information and writing the warning ticket, the defendant asked him if he was "messing" with him because he is a black man, which Trooper Flack denied. The trooper explained again that following too closely was a fatal five violation, that the defendant should have known how dangerous it was because he was employed as a truck driver, and that the defendant's race had nothing to do with the traffic stop. The trooper reiterated that he had stopped the defendant for following less than one second behind the camper trailer. Trooper Flack also asked the defendant a few questions about where he was traveling to. While the trooper was talking with the defendant, the dispatcher was providing information over the radio about the defendant's record. The defendant explained that he was following unusually close behind the camper trailer because he had just pulled in behind it. Trooper Flack told the defendant again that he was only writing a warning ticket for the offense.
¶ 9 Trooper Flack testified that he ran a driver's license check on the computer in his squad car. He received information that the defendant had a valid driver's license and an FBI number. Because the defendant had an FBI number, he also ran a criminal history background check. After 7 minutes and 50 seconds had elapsed on the recording, Trooper Flack asked the defendant about his arrest record. The defendant told him that he had been arrested for fighting and second-degree murder 12 years earlier. At approximately 8 minutes and 50 seconds into the recording, Trooper Flack asked the dispatcher to run the defendant's FBI number, and then at about 9½ minutes, he called back to tell the dispatcher that he had made a mistake on the FBI number and gave her the correct number. After about 10 minutes, Trooper Flack asked the defendant if he had ever been arrested for an offense involving marijuana, and the defendant said that he did not even smoke marijuana. Trooper Flack then requested the defendant to lean his head back and close his eyes. Trooper Flack testified that he observed tremors in the defendant's eyes which indicated recent marijuana usage. After 11 minutes and 40 seconds had elapsed on the recording, Trooper Flack asked the defendant again if he smoked at all, and when the defendant denied any smoking, he told the defendant that his eyes were telling a different story.
¶ 10 Trooper Flack testified that, in March 2009, he had completed a DUI cannabis course in which he learned that tremors in a person's upper eyelids are one indicator of recent cannabis use. He stated that, in his career, he had observed hundreds of people impaired by cannabis use and that different people indicated cannabis impairment in different ways. He considered the fact that the defendant was following the camper trailer with less than a one-second interval between them to be a factor in his need to determine if the defendant was impaired in some way.
¶ 11 After 11 minutes and 45 seconds elapsed on the recording, Trooper Flack asked the defendant if he had any gun charges and if there was anything illegal in his car. At about 12 minutes and 15 seconds into the videotape, the defendant refused to consent to a search of his car. At about 13 minutes and 50 seconds, the trooper asked the defendant which of two addresses was his correct mailing address. At about 14 minutes and 25 seconds, he asked the dispatcher if she had received a response on the defendant's FBI number yet, and then the dispatcher began to recite *388 the defendant's lengthy criminal history, ending her recitation after about 16 minutes of the recording had elapsed. Trooper Flack testified that he believed the defendant was being deceptive about his arrest history because the dispatcher told him that the defendant had been arrested on a cannabis charge a couple of months before this traffic stop, but the defendant had not mentioned any arrests other than those for fighting and second-degree murder. Trooper Flack deployed his canine to conduct a sniff test of the exterior of the defendant's car after about 16½ minutes of the recording had elapsed.
¶ 12 In response to a question from defense counsel about what information Trooper Flack received to prolong the traffic stop, he testified:
"A. Okay. When I made the initial approach, I observed red glassy eyes, which [are] consistent with cannabis use, but as you said it could be other things also, and it's my duty as a police officer to investigate a little further. I noticed he had [a] criminal history. I observed tremors in his upper eyelids which [are] also consistent with cannabis use. Those are the indicators what I was observing at that point, which is why I chose to deploy my canine around the car."
¶ 13 Trooper Flack explained how he and Rohdee are trained to search the exterior of a vehicle:
"A. Okay. We always start at the front of the car and we go around the car twice. The first one [is] just a quick pass and the other one's detailing, which is checking high and low. And then we're also trained where if the dog gets any odor of narcotics and we see that the * * * body posture changed in the dogs, we do not stop them from doing that. We let him go to the source on his own instead of correcting him and waiting for us to initiate the sniff."
Trooper Flack testified that he and Rohdee began the sniff test at the front of the defendant's car, that the driver's side window was rolled down, and that the wind was blowing toward the front of the car. Trooper Flack observed a "heavy breathing rate change" in Rohdee. After approximately 17 minutes and 15 seconds into the recording, Rohdee pulled him over to the driver's window and alerted before the trooper gave the command to start sniffing.
¶ 14 Trooper Flack testified that he has always been able to articulate why Rohdee alerted in every official search they have conducted. He said, "There is either marijuana residue or they [the suspects] admitted that they were smoking." He testified that Rohdee is not trained to alert to weapons or nitrate residue. Rohdee had never been wrong on the streets but, one time, out of thousands of practice searches, Trooper Flack was not able to identify the source of Rohdee's alert.
¶ 15 At about 18 minutes and 24 seconds into the recording, Trooper Flack completed the dog sniff and told the defendant that Rohdee had alerted to his car. The trooper told the defendant to exit the squad car, and he conducted a pat-down search of the defendant. The defendant stated that someone had smoked marijuana in his car earlier. Another police officer arrived on the scene, and Trooper Flack secured Rohdee in the kennel in his squad car. Trooper Flack acknowledged that the defendant was not free to leave at any time after entering his squad car because he was detained for the traffic stop, but he testified that, if Rohdee had not alerted to the car, the defendant would have been free to leave after he completed the sniff test.
*389 ¶ 16 At about 20 minutes and 20 seconds into the videotape, the trooper began to search the interior of the defendant's car. During the search, he found seven plastic baggies rolled tightly together with a rubber band. The roll of baggies was in the pocket of a pair of pants inside a laundry basket on the front portion of the backseat, with the open end of the basket facing toward the front of the car between the driver's and the passenger's seats. After he opened the roll of baggies at the jail, he found they each contained a white powdery substance later determined to be cocaine. He also found a handgun in the trunk of the car. The gun was in a locked box that he opened with a key from the defendant's key chain. The gun's serial number had been removed and appeared to have been filed off. At approximately 35 minutes and 40 seconds into the videotape, after he discovered the gun, Trooper Flack arrested the defendant.
¶ 17 The trial court stated that it had considered the testimony and evidence presented and had reviewed the recording of the traffic stop but found it unclear how the trooper was able to see the defendant's vehicle. The court stated, "And it appears from looking at the actual tape, that [the trooper's] speed was increased in order to actually apprehend the Defendant's vehicle." The court noted that the recording showed the trooper's vehicle approaching and "from the vantage point of the camera when you're looking at a portion of the tape, you can see the complete rear of the camper trailer and the vehicles behind it." The court found that the only possible reason for the traffic stop was the trooper's belief that the defendant was violating the statute prohibiting following too closely behind another vehicle. The court found that the trooper had testified that the defendant's vehicle was less than a second behind the camper, but that when the court reviewed the recording of the traffic stop, the recording did "not reflect that." The court acknowledged that the statute does not include any guidelines to define what following too closely means, and that the "statute is very subjective with respect to what may be too closely in different circumstances."
¶ 18 The court noted that the trooper observed the defendant's eyes to be red and glassy from the passenger window of his car but did not smell the odor of any cannabis or alcohol or any other substances. The court stated that, even though the trooper suspected that the defendant was impaired, he did not conduct any field sobriety tests and did not testify that the defendant's vehicle had weaved. The court questioned the trooper's inquiries about the defendant's prior criminal history but did not state why that inquiry was questionable. The court specifically noted that the trooper "couldn't give distance of any type of feet and did not give and could not give any distance in car lengths" between the defendant's vehicle and the camper trailer he was following.
¶ 19 The court ruled that it found no probable cause for the initial stop of the defendant's vehicle. As an alternate basis for the ruling, the court found that, even if the trooper had probable cause for the initial stop, the duration of the stop was prolonged longer than necessary to write a warning ticket. Finally, the court ruled, "[T]he State did not present any evidence as to the training or qualifications of Trooper Flack, the handler of the canine Rohdee or any training or qualifications of the canine Rohdee, which in order to get this type of evidence admitted into court, I believe based upon the fact it was a sniff, would have to be supported by the State." The court granted the defendant's motion to suppress evidence and statements, and this appeal followed.

*390 ¶ 20 ANALYSIS
¶ 21 A review of a trial court's ruling on a motion to suppress involves mixed questions of law and fact. People v. Jones, 215 Ill.2d 261, 267, 294 Ill.Dec. 129, 830 N.E.2d 541 (2005).
"Findings of historical fact made by the circuit court will be upheld on review unless such findings are against the manifest weight of the evidence. This deferential standard of review is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony. However, a reviewing court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted. Accordingly, we review de novo the ultimate question of whether the evidence should be suppressed." Jones, 215 Ill.2d at 268, 294 Ill.Dec. 129, 830 N.E.2d 541.
¶ 22 The fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution guarantee citizens the right to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const.1970, art. I, § 6. Stopping a vehicle and detaining its occupants constitutes a seizure under the fourth amendment to the United States Constitution. People v. McQuown, 407 Ill.App.3d 1138, 1144, 348 Ill.Dec. 332, 943 N.E.2d 1242 (2011). "The central requirement of the fourth amendment is reasonableness." Jones, 215 Ill.2d at 268, 294 Ill.Dec. 129, 830 N.E.2d 541. "Because a traffic stop is more analogous to a Terry investigative stop (see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) than to a formal arrest, the reasonableness of a traffic stop is analyzed under Terry principles." People v. Bunch, 207 Ill.2d 7, 13-14, 277 Ill.Dec. 658, 796 N.E.2d 1024 (2003). A Terry analysis involves a dual inquiry: (1) whether the officer's action was justified at its inception and (2) whether it was reasonably related in scope to the circumstances that initially justified the stop. People v. Al Burei, 404 Ill. App.3d 558, 562-63, 344 Ill.Dec. 591, 937 N.E.2d 297 (2010). The general rule is that a police officer is justified in stopping and briefly detaining a driver when he or she observes the driver commit a traffic offense. McQuown, 407 Ill.App.3d at 1143, 348 Ill.Dec. 332, 943 N.E.2d 1242. "During a lawful seizure, * * * the police may ask questions unrelated to the original detention and are not required to form an independent reasonable suspicion of criminal activity before doing so." People v. Harris, 228 Ill.2d 222, 242-43, 319 Ill. Dec. 823, 886 N.E.2d 947 (2008). Under the second prong of the Terry analysis of a traffic stop, the sole inquiry is whether the officer's actions unreasonably prolonged the duration of the detention. Harris, 228 Ill.2d at 244, 319 Ill.Dec. 823, 886 N.E.2d 947.
¶ 23 We first consider the trial court's ruling that the trooper did not have probable cause for the initial traffic stop. The court based its ruling, at least in part, on the finding that the trooper had not been able to state the distance between the vehicles in terms of feet or car lengths. As the trial court noted, the statute that prohibits drivers from following other vehicles too closely does not prescribe any method by which law enforcement officers are required to calculate the distance or time interval between two vehicles but states only that a driver "shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." *391 625 ILCS 5/11-710(a) (West 2008). Therefore, we reject, as a matter of law, the trial court's implicit ruling that the trooper was required to state the distance between the vehicles in support of his decision to initiate a traffic stop for following too closely.
¶ 24 We have carefully reviewed the entire record, including the recording of the traffic stop. The trial court's comments that the trooper accelerated before initiating the stop are irrelevant to any issue. The court did not state any reason why acceleration would be a problem, and we are aware of none. The recording shows that the trooper accelerated for only a few seconds before he followed the defendant's car and then activated his overhead lights. Contrary to the trial court's finding, the squad car followed the defendant's car for a sufficient amount of time for the trooper to reasonably determine that the defendant was following the camper trailer too closely. Accordingly, the trial court's finding that the recording did not reflect that the defendant's car was following too closely is against the manifest weight of the evidence.
¶ 25 When a police officer observes an individual operating a motor vehicle violate a traffic law, the officer's decision to stop that vehicle is supported by probable cause. See Jones, 215 Ill.2d at 271, 294 Ill.Dec. 129, 830 N.E.2d 541 (where officer observed inoperable taillights on the defendant's vehicle, the court found the initial stop "was supported by probable cause and, therefore, was justified at its inception"). Trooper Flack specifically testified that he used a method of counting the dotted lines on the roadway to determine the time interval between the vehicles, based on the guidelines set forth in the Illinois Rules of the Road. Using that method, he determined that the defendant was following too closely. The defendant did not challenge this testimony or present any evidence that any other method of determining whether a vehicle is following too closely is required. We find the trooper's testimony sufficient to justify initiating a traffic stop of the defendant's vehicle, and the digital recording does not contradict his testimony. The trial court's factual findings to the contrary are against the manifest weight of the evidence.
¶ 26 We find that it was objectively reasonable for Trooper Flack to rely on the Illinois Rules of the Road guideline that a driver follows another vehicle too closely when there is less than a two-second interval between the vehicles. Given the statute's lack of direction, the trooper's testimony that he had over nine years' experience with the Illinois State Police and that he observed the defendant's vehicle following too closely for over one-half mile demonstrated sufficient probable cause for him to initiate the traffic stop. "The probability of criminal activity, rather than proof beyond a reasonable doubt, is the standard for determining whether probable cause is present." People v. Beck, 167 Ill.App.3d 412, 417, 118 Ill.Dec. 201, 521 N.E.2d 269 (1988).
¶ 27 Having determined that the trooper had probable cause to initiate the traffic stop, we next consider the second prong of the Terry analysis. Police conduct during an otherwise lawful seizure does not render it unlawful "unless it either unreasonably prolongs the duration of the detention or independently triggers the fourth amendment." People v. Baldwin, 388 Ill.App.3d 1028, 1033, 328 Ill.Dec. 683, 904 N.E.2d 1193 (2009). Where the traffic stop is lawful at its inception and otherwise executed reasonably, the lawful nature of the traffic stop does not change unless there is additional conduct that violates an individual's constitutionally protected *392 privacy interest. Baldwin, 388 Ill. App.3d at 1033, 328 Ill.Dec. 683, 904 N.E.2d 1193 (quoting Illinois v. Caballes, 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005)). There is no bright-line rule for deciding if a traffic stop has been unreasonably prolonged, but the duration of the stop must be justified by the nature of the offense and the ordinary inquiries incident to the stop. McQuown, 407 Ill.App.3d at 1144, 348 Ill.Dec. 332, 943 N.E.2d 1242. On review, we are to consider the totality of the circumstances, the length of the stop, and whether the officer acted diligently. McQuown, 407 Ill.App.3d at 1145, 348 Ill.Dec. 332, 943 N.E.2d 1242.
¶ 28 Here, there is no claim that the actions of the officer independently triggered the fourth amendment. The officer's questioning of the defendant does not raise fourth amendment issues since "the police may ask questions unrelated to the original detention and are not required to form an independent reasonable suspicion of criminal activity before doing so." Harris, 228 Ill.2d at 242-43, 319 Ill.Dec. 823, 886 N.E.2d 947. Likewise, it is settled law that the use of a well-trained narcotics-detection dog  one that does not expose noncontraband items that otherwise would remain hidden from public view  during a lawful traffic stop, generally does not implicate legitimate privacy interests because any interest in possessing contraband cannot be deemed legitimate. Caballes, 543 U.S. at 408-09, 125 S.Ct. 834. "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." Caballes, 543 U.S. at 410, 125 S.Ct. 834. Thus, the sole issue in this case under the second prong of the Terry analysis is the duration of the stop.
¶ 29 The trial court in this case found that the duration of the traffic stop was longer than necessary to write the warning ticket. We disagree and hold that the trial court's finding is against the manifest weight of the evidence.
¶ 30 The entire time that elapsed from one minute before the officer activated his overhead lights until Rohdee alerted on the defendant's car was approximately 17 minutes. Most of this time was devoted to the trooper checking the defendant's driver's license and FBI number and attempting to determine if he was an impaired driver. A computerized warrant check of the occupants of a lawfully stopped vehicle does not violate fourth amendment rights so long as the duration of the stop is not unnecessarily prolonged by the check. Harris, 228 Ill.2d at 237, 319 Ill.Dec. 823, 886 N.E.2d 947. Here, we believe the trooper's check of the defendant's driver's license and FBI number was reasonable under the circumstances and did not unnecessarily prolong the stop. Likewise, in our view, it was reasonable for the trooper to employ a method he had learned in his police training to determine if the defendant was an impaired driver.
¶ 31 From the initial investigative traffic stop through the dog sniff of the exterior of the car and the trooper's search of the interior of the car, the trooper acted reasonably under the circumstances, increasing the level of intrusion only as new information came to his attention. The trooper obtained information at each stage of the investigation that required further investigation and that necessarily increased the time from the stop until the defendant's arrest. Under the facts presented, the duration of the traffic stop was not unreasonable and the trial court's determination that the duration of the stop was prolonged longer than necessary to write a warning ticket is manifestly erroneous.
*393 ¶ 32 Finally, we consider the trial court's ruling that the State did not present sufficient evidence of Trooper Flack's or Rohdee's training and experience. When the defendant files a motion to suppress, he has the burden of proving that the search and seizure were unlawful. 725 ILCS 5/114-12(b) (West 2008). If the defendant makes a prima facie showing of an illegal search and seizure, the burden shifts to the State to present evidence to counter the defendant's prima facie case. People v. Gipson, 203 Ill.2d 298, 307, 272 Ill.Dec. 1, 786 N.E.2d 540 (2003). "However, the ultimate burden of proof remains with the defendant." Gipson, 203 Ill.2d at 307, 272 Ill.Dec. 1, 786 N.E.2d 540.
¶ 33 The State concedes that the defendant presented a prima facie case by showing that Trooper Flack conducted a warrantless search of his vehicle without his consent. See People v. Parker, 354 Ill.App.3d 40, 45, 289 Ill.Dec. 941, 820 N.E.2d 1016 (2004) (generally, searches and seizures are reasonable only if the government first obtains a warrant, unless, under a recognized exception to the warrant requirement, such as the automobile exception, the officer has reason to believe that a crime has occurred and evidence of the crime is located in the automobile). The defendant's valid consent to search his vehicle can also provide a sufficient basis for a warrantless search. People v. Ledesma, 327 Ill.App.3d 805, 813, 261 Ill.Dec. 557, 763 N.E.2d 806 (2002).
¶ 34 In the case at bar, Trooper Flack based his search of the interior of the vehicle, and his subsequent seizure of cocaine and an illegal handgun, on the behavior of his canine, Rohdee. Under the Supreme Court's analysis in Caballes, a well-trained narcotics-detection dog is one that does not detect otherwise lawful items in which the citizen has a legitimate privacy interest. Caballes, 543 U.S. at 409, 125 S.Ct. 834. In the case we are reviewing, the trooper testified that Rohdee was not trained to detect weapons or nitrate residue. The trooper explained in detail the manner in which he conducts a canine search. He testified that he had been a canine handler for two years and that, in the thousands of practice searches he had conducted with the dog, only once had Rohdee alerted to a vehicle when it could not be determined that drugs were hidden in the vehicle. The trooper testified without contradiction that Rohdee had never been wrong in an alert in an actual search. In every actual search, the trooper was able to verify the location of drugs, including marijuana, marijuana residue, or the odor from the occupant's admission of smoking marijuana. This evidence, together with the trooper's testimony about the procedure he uses when he conducts a dog sniff with Rohdee and the trooper's overall experience of almost a decade with the Illinois State Police, was sufficient to rebut the defendant's prima facie case of an improper basis for the search of the vehicle. Accordingly, the trial court's ruling that the State failed to present sufficient evidence of the trooper's or Rohdee's training and experience is manifestly erroneous.

¶ 35 CONCLUSION
¶ 36 For all of the foregoing reasons, the trial court's order granting the defendant's motion to suppress evidence and statements is reversed, and this case is remanded for further proceedings.
¶ 37 Reversed and remanded.
Presiding Justice DONOVAN and Justice SPOMER concurred in the judgment and opinion.