# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *People v. Kolesnikov*, 2020 IL App (2d) 180787

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DMITRY KOLESNIKOV, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-18-0787 |
| Filed | August 24, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 17-CF-1774; the Hon. James K. Booras, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Steven L. Walker, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and David Friedland, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Jorgensen concurred in the judgment and opinion. |

¶ 1        Defendant, Dmitry Kolesnikov, was convicted of unlawful possession of cannabis (720 ILCS 550/5(f) (West 2016)). The trial court imposed a three-year sentence. The trial court determined that police officers' entry into defendant's home was justified in accordance with the community-caretaking doctrine and that they were lawfully inside defendant's premises when they observed cannabis plants in plain sight. Defendant now appeals, and for the reasons that follow, we affirm.

¶ 2                                              I. BACKGROUND

¶ 3        On June 27, 2017, at about 8 a.m., police were dispatched to defendant's residence. Defendant's ex-girlfriend had made a 911 call and indicated that defendant was suicidal. Two officers, Ken Berryhill and Rebecca Foy of the Vernon Hills Police Department, arrived and made contact with defendant outside of the residence. Subsequently, they entered and observed cannabis plants in plain view. They then obtained a warrant and seized the plants. Defendant moved to suppress, challenging the officers' entry into the house. A hearing was held on defendant's motion.

¶ 4        Berryhill testified first at the hearing. He stated that he was dispatched to defendant's home along with Foy. They arrived in separate cars at about 8 a.m. Both officers were in uniform. Berryhill testified that they were "dispatched to a possible suicidal subject where the complainant was an ex-girlfriend of the subject." The complainant "had received some emails from [defendant's] account stating that he wished to commit suicide and left [*sic*] a picture of a knife." Berryhill was informed that defendant was the subject. A driver's license photograph of defendant was sent to Berryhill.

¶ 5        Berryhill and Foy approached the front door of defendant's residence (defendant lived in a townhouse). They knocked or rang, and defendant answered the door. Defendant was wearing a bathrobe. He had no shirt on, and Berryhill could not tell if he was wearing shorts. They spoke with defendant, who "appeared intoxicated; slow, sluggish, groggy." They asked if they could come in, and defendant said that they could not. They told defendant that they needed to speak with him, and defendant stepped outside. Defendant responded to the officers' questions "[v]aguely." He told the officers who he was and acknowledged knowing the complainant, but he did not say "much above and beyond that." When asked about the e-mails the complainant had received, defendant "appeared confused" and "[d]idn't answer either yes or no." Defendant stated that he had been drinking and had just woken up. Berryhill could observe no physical injuries but noted that defendant's bathrobe had long sleeves.

¶ 6        An ambulance had also been dispatched to the scene. While the officers were speaking with defendant, Foy received a text message containing the picture defendant had sent to his ex-girlfriend. The image showed the "crotch area" of a person wearing jeans sitting in what appeared to be water with a large knife on his lap. Foy showed defendant the image and asked if he had sent it. Defendant would not answer "yes or no" and seemed confused. They told defendant that they wanted to get him checked out because "he just wasn't acting appropriately." Defendant was not wearing jeans when the officers spoke with him, and he did not appear wet. They took defendant to the ambulance. The officers were "[c]oncerned that possibly there might be someone hurt inside the house." They thought that possibly the subject

in the picture was not defendant. Berryhill added, "We [were] not really sure what's—has gone on in this house."

¶ 7    Accordingly, they decided to enter the house "[t]o see if there was a person that's still sitting in a bathtub with a knife in their lap." They "weren't sure what exactly was going on." Berryhill explained that defendant "was not being very forthcoming as far as that he had sent these images or even that it was him." The officers had "no intent to look for any sort of contraband." They did not look in any drawers or cabinets but looked merely "in rooms for human beings." They quickly checked the first floor and then Berryhill went downstairs to the basement. Berryhill noted a light shining through a partially open door. He opened the door fully and observed marijuana plants growing out of buckets. Berryhill went back upstairs and told Foy what he had found. They then checked the rest of the residence for people. They heard a toilet flush, and a man came out of a bathroom (the man is a codefendant who is not involved in this appeal). They placed him under arrest. After completing their sweep of the house, they secured it and sought a warrant.

¶ 8    On cross-examination by counsel for the codefendant, Berryhill testified that his dispatch to defendant's residence would not have terminated when they secured defendant in the ambulance regardless of whether he had discovered the cannabis. He explained that the fact that they could not identify the person in the photograph with the knife on his lap, along with defendant's evasiveness, raised a concern that someone else might be in need of assistance in the house. Berryhill acknowledged that ambulance personnel rolled defendant's sleeve up, which revealed injuries to defendant's arm. He further agreed that when he first made contact with defendant, defendant was not wearing jeans and was not wet. Defendant told Berryhill that he had just woken up. Berryhill testified that no one had told him that someone else might be in the house. In fact, defendant had stated that there was no one else in the house. However, Berryhill explained, he was not sure whether to believe defendant, as defendant had appeared evasive in response to their questions. Berryhill acknowledged that he entered the house after he had identified defendant as the person they were looking for and observed in the ambulance injuries on defendant that were consistent with an attempted suicide.

¶ 9    On cross-examination by defendant's attorney, Berryhill acknowledged that, although he had not previously been to defendant's residence, he had been to other similar residences in the housing complex, so he was familiar with their layout. He denied knowing that bathrooms were on the second floor. When dispatch first communicated with Berryhill, it was related that there had been a report of a suicidal individual named Dmitry called in by the subject's ex-girlfriend, who had received an e-mail from the subject threatening suicide. The e-mail was in Russian. The message from dispatch did not express any concerns about anybody besides defendant. Foy was texted a photograph of defendant. When they first encountered defendant at the front door, Foy did most of the talking. Defendant was calm, albeit sluggish and apparently intoxicated. He was not aggressive, made no furtive movements, and did not attempt to evade or disengage from the officers. Based on the photograph that had been texted to Foy, the officers determined that the man at the door was the subject of the suicide threat. Defendant denied their request to enter the residence. They asked defendant to step out of the house, and he complied. They spoke with defendant for about 5 to 10 minutes before they brought him to the ambulance. Berryhill testified that defendant's behavior was not unusual, "[o]ther than he was unable to explain why these images were sent; whether he even sent them; or anything like that; you know, there was offered no explanation for what we were there to

talk to him about." They heard no sounds coming from the house and did not speak with any of the neighbors. A couple other officers arrived while Berryhill and Foy spoke with defendant.

¶ 10 When asked whether he was concerned that someone else might be in need of assistance inside the house, Berryhill stated:

"During our conversations with him; and the fact that he was not making admissions to that—to even sending those emails; we weren't sure exactly what was going on at that point; whether he was the person depicted in that or not. And we started having concerns that maybe there is someone else in the house at that point."

At the ambulance, Berryhill observed several small cuts on defendant's left forearm, which he described as "superficial." There was little or no bleeding. Berryhill agreed that this confirmed that defendant was the subject of the call made by defendant's ex-girlfriend.

¶ 11 Berryhill agreed that they did not rush into the house after leaving defendant at the ambulance. When asked whether he had any information that would have led him to believe that there was someone else in the house, Berryhill replied, "We had the photograph that we weren't sure was Dmitry." They made a warrantless entry of the house. Defendant was not under arrest. Berryhill testified that he was not concerned about the knife. He agreed that defendant's residence was similar to other residences in the complex in which he had previously been. Berryhill stated that he did not know where the bathtub was in these units, as he had primarily been in the front living area in the past.

¶ 12 On recross by the codefendant's attorney, Berryhill testified that defendant was able to identify himself when Berryhill first made contact with him. Before Berryhill entered defendant's residence, he was aware of the content of the e-mail threatening suicide. However, though it came from defendant's e-mail account, defendant did not acknowledge sending it and in fact denied doing so; hence, Berryhill was not certain who actually sent it. When Berryhill first entered defendant's residence, he passed through the living room, entered the kitchen, and then went downstairs to the basement. He acknowledged that there was a staircase leading to the second floor in the living room and that he bypassed it to go to the kitchen. The only bathtub in the residence was on the second floor. Berryhill agreed that he was looking for someone sitting in a bathtub.

¶ 13 The parties stipulated that the information garnered by Berryhill and Foy provided the sole basis for the warrant pursuant to which the cannabis plants were seized. They further stipulated that the plants were, in fact, seized.

¶ 14 Foy testified next for the State. She stated that, on June 27, 2017, she was dispatched to a location regarding a suicidal subject. She was in uniform and driving a squad car. She had been informed that the ex-girlfriend of the subject had received an e-mail in Russian stating that he was going to harm himself. Berryhill arrived at approximately the same time Foy did. Foy had been provided with a picture of defendant. Dispatch also sent Foy a copy of the actual e-mail received by defendant's ex-girlfriend, which included a photograph of the "torso" or "crotch area" of a person, with a hand and a large knife visible. The person was wearing jeans, which appeared to be wet. The person seemed to be sitting in a bathtub or in "[s]ome sort of water."

¶ 15 Foy and Berryhill approached defendant's door and knocked. Defendant answered. He was wearing a bathrobe, which was dry. Defendant "appeared to be extremely intoxicated, very evasive, [and] did not want to give a lot of information." Foy asked if they could come in, and defendant declined. She told defendant why they were there. Foy asked defendant about the

- 4 -

photograph, and "he did not confirm nor deny but really didn't have much to say to us." She could not tell if defendant had been injured. Eventually, they called the ambulance, which had been "staging" down the street, forward. They took defendant to the ambulance.

¶ 16     At that point, Foy testified, they "decided to go in and do a protective sweep of the house just to make sure there was nobody hurt inside because we could not confirm that he was the one in the picture." Foy testified that they were concerned that "there could be someone hurt inside." Her concerns were based on the photograph of the person with the knife. They entered and proceeded through the living area to the kitchen. Foy remained in the kitchen while two other officers went downstairs. Subsequently, she and Berryhill went upstairs, where they encountered and arrested the codefendant, after which she checked the rest of the upstairs.

¶ 17     On cross-examination by defendant's attorney, Foy testified that, although they were aware that the e-mail threatening suicide came from defendant's e-mail address, they were not certain that defendant had sent it. She acknowledged that dispatch related to her that defendant was the suicidal individual. As she approached defendant's door, she did not hear any "yelling or screaming from the house." When defendant answered the door, Foy was able to identify him from his driver's license photograph. After defendant stepped out of his residence, they spoke with him for about four or five minutes on his front porch. Foy agreed that they did not rush into the residence as soon as defendant was taken to the ambulance. They entered the house to determine if there were any additional victims.

¶ 18     On cross-examination by the codefendant's counsel, Foy reiterated that they did not know whether defendant was the person in the photograph with the knife. She was asked, "And because you did not know, you decided it was a good idea to just check the house?" Foy replied, "For additional victims, absolutely."

¶ 19     The trial court then ruled on defendants' motion to suppress the evidence. The court began its discussion by reviewing the testimony on why the officers entered defendant's residence. It first noted that the police "had no suspicion" and were not investigating a crime when they came to defendant's residence. Rather, they were there to check on the well-being of a suicidal person. They knocked and defendant answered the door in "a drunken state." Defendant did not provide the officers with any information regarding the issue for which they were dispatched. The trial court found, "Since they were not getting too many answers from the defendant, they had no idea if there was anyone else left in the house." The trial court continued, "They didn't know what had happened in the house, what precipitated their call there." Moreover, "They were not clear other than having that email and the defendant's suicidal communication including the picture with the knife." The trial court further observed that, after defendant was transported away in the ambulance, the officers had to secure the house. In the course of so doing, they needed to make sure that no one else, including possibly children, was left inside. Thus, the officers were acting "in a reasonable way to discharge their community-caretaking duties."

¶ 20     The trial court then found that, in the course of checking the house, the officers discovered the cannabis in plain view. The trial court also found that the officers were acting in good-faith reliance on the warrant when they seized the cannabis plants. It then denied defendant's motion to suppress. Defendant filed a motion to reconsider. The trial court denied this motion, explaining that the officers were acting in furtherance of their community-caretaking duties. They needed to ascertain whether there were additional victims in the house. The court

reiterated its concern that there could have been children in the house and that the officers needed to see if this were so prior to securing the residence.

¶ 21 Thereafter, the trial court held a bench trial on the stipulated evidence. The parties also agreed to a three-year sentence of imprisonment should defendant be convicted. The State recited the evidence to which the parties stipulated. It then nol-prossed count VII (possession of a controlled substance). The trial court convicted defendant of count II (possession of cannabis) and sentenced him to the three-year sentence previously agreed upon. The trial court denied defendant's motion for a new trial, and this appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23 On appeal, defendant raises a number of arguments. As a threshold issue, he argues that the police officers' warrantless entry into his home was not justified by the community-caretaking doctrine or the emergency-aid doctrine. He asserts that there were no exigent circumstances and that there was no objective indication that either a crime had been committed or an emergency existed. Predicated on the success of this initial argument, defendant goes on to argue that, since the officers were not in a place in which they were entitled to be when they observed the cannabis plants, the plain-view doctrine is inapplicable and they could not have been acting in good-faith reliance on the warrant they obtained based on their illegal entry.

¶ 24 When reviewing a trial court's decision on a motion to suppress evidence, a court of review is presented with a mixed question of law and fact. *People v. McQuown*, 407 Ill. App. 3d 1138, 1143 (2011). Questions of historical fact are reviewed using the manifest-weight-of-the-evidence standard. *Id.* As such, they will be reversed only if an opposite conclusion is clearly apparent. *People v. Colquitt*, 2013 IL App (1st) 121138, ¶ 28. However, the ultimate question of whether suppression was warranted is reviewed *de novo*. *Id.* ¶ 29. With these standards in mind, we turn to defendant's arguments.

¶ 25                    A. THE COMMUNITY-CARETAKING DOCTRINE

¶ 26 The trial court relied on the community-caretaking doctrine in finding that the officers' warrantless entry into defendant's residence was justified. Our supreme court has explained that "community caretaking refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime, such as helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home." *People v. McDonough*, 239 Ill. 2d 260, 269 (2010). Thus, for the doctrine to apply, two conditions must be met. First, the officers' actions, viewed objectively, must involve "some function other than the investigation of a crime." *Id.* at 272. Second, a search or seizure resulting from such actions must be reasonable, measured objectively, in light of the public-safety function the officers are engaged in. *Id.* Reasonableness is assessed with reference to the totality of the circumstances. *Id.* In determining whether a search or seizure is justified pursuant to the community-caretaking doctrine, a "court must balance a citizen's interest in going about his or her business free from police interference against the public's interest in having police officers perform services in addition to strictly law enforcement." *Id.* Here, we have little difficulty concluding that the officers' actions fell within the ambit of the community-caretaking doctrine.

¶ 27 Initially, we must consider the trial court's findings of historical fact, to which we owe deference. *McQuown*, 407 Ill. App. 3d at 1143. While this is a relatively straightforward case and the facts are largely undisputed, we note several findings that have significant relevance here. The trial court found that the police did not intend to "investigate either a crime or to merely snoop around on suspicion that there may be a crime." When defendant answered the door, he was intoxicated. Further, "[h]e was not providing information regarding the reason why [the police] were called there." Since they were not getting any information from defendant, "they had no idea if anyone else [was] left in the house" and "[t]hey did not know if there was a victim in the house." We cannot say, and defendant does not contend, that these findings are against the manifest weight of the evidence.

¶ 28 Given the trial court's findings, the first prong of the community-caretaking analysis is satisfied—the officers were not investigating a crime. See *McDonough*, 239 Ill. 2d at 272. The question remains as to whether their conduct was reasonable under the circumstances. We hold that it was. A suicide threat was communicated from defendant's e-mail account. While the message purported to be from defendant, defendant was evasive when asked about the e-mail. A picture of the torso of an individual holding a large knife accompanied the e-mail. The identity of the person in the e-mail was not certain. The individual in the photograph was wearing jeans and was wet. Defendant was wearing a robe and was dry. When shown the image and asked whether it was him, defendant would not answer yes or no. We also note the limited scope of the officers' search. They swept the premises looking for other individuals. They did not look in drawers or cabinets, where only small objects could be concealed. Given the information available to the officers and the limited nature of the search, we hold that the officers' conduct was objectively reasonable.

¶ 29 In arguing for a contrary result, defendant cites *People v. Mikrut*, 371 Ill. App. 3d 1148 (2007). In that case, a woman who had been staying in the defendant's home asked the police for assistance in retrieving her personal belongings from the home. She stated that she was afraid of the defendant. She told the police that the defendant owned guns, and the police determined that the defendant did not have a valid FOID card. Officers accompanied the woman to the defendant's home. The defendant told the officers that he did not want them in his home. The officers explained why they were there, and the defendant went to the living room, where he remained with two officers. A third officer accompanied the woman to a bedroom to retrieve her possessions. While in the bedroom, the woman opened a closet, and the officer observed a rifle. The defendant was arrested. The defendant moved to suppress the firearm. The trial court granted the motion because the defendant had denied the officers permission to enter and, once the defendant was secured in the living room, there was no reason for an officer to accompany the woman to the bedroom. *Id.* at 1150.

¶ 30 On appeal, the State argued that the community-caretaking doctrine justified the officers' entry into the defendant's home. *Id.* at 1152. The reviewing court agreed that, "in the exercise of their community caretaking function, the police were justified in doing what was necessary to prevent violence between [the defendant] and [the woman]." *Id.* at 1153. However, it further held that this "did not give the police a general warrant to intrude wherever they wanted." *Id.* Rather, "the intrusion had to be strictly circumscribed by the exigencies justifying its initiation." *Id.* That is, "[w]hen officers have accomplished their caretaking purpose, they may not continue to expand the scope of an intrusion without additional justification." *Id.*

¶ 31    Defendant argues that, in this case, the officers had accomplished their caretaking purpose when they identified defendant and brought him to the ambulance, at which time they noted the superficial cuts on his arm. However, in *Mikrut*, it was undeniably clear that the officers' purpose had been accomplished when they secured the defendant in the living room. In this case, ambiguity persisted after defendant was taken to the ambulance. A suicide threat accompanied by a photograph was transmitted to defendant's ex-girlfriend from defendant's e-mail account. Defendant would neither confirm nor deny that he sent the e-mail or that he was the person in the photograph. Thus, *Mikrut* is distinguishable because there the police knew that they had accomplished their purpose; conversely, here, that was not clear.

¶ 32    Defendant also relies on *People v. Hand*, 408 Ill. App. 3d 695 (2011), where the defendant's husband expressed his concerns to a police officer about his wife's mental health and the safety of their children, who were in her company. The officer knocked on the defendant's front door and received no answer. The officer got a key from the husband and attempted to enter. The defendant responded by swinging a baseball bat at the officer, but he was eventually able to enter and subdue the defendant. *Id.* at 696-97. The *Hand* court determined that the officer's entry was justified by the community-caretaking doctrine, as the officer was attempting to check on the children's well-being. *Id.* at 702-03. Similarly, in *People v. Woods*, 2019 IL App (5th) 180336, ¶ 34, also cited by defendant, a witness's complaint of a minor left unattended in a house was held to justify an entry by the police pursuant to the community-caretaking doctrine.

¶ 33    Defendant points out that, in both *Hand* and *Woods*, there was objective evidence that children were inside the houses who were potentially in peril. Conversely here, defendant argues, there was no indication that anyone else was in jeopardy. Defendant asserts that he was home, he answered the door, the police could identify him from his driver's license photograph, and he had cut marks on his arm. This, defendant contends, should have terminated the officers' well-being check. As we read *Hand* and *Woods*, the differences between them and the instant case are of degree rather than kind. In those cases, witnesses told the police that children were inside the homes. In this case, the officers were in possession of a photograph of a subject holding a knife, who remained unidentified, and defendant refused to identify the subject and was generally evasive. Though this evidence was perhaps not as specific as the evidence in *Hand* and *Woods*, we nevertheless hold it sufficient to raise a reasonable belief that someone else in the residence might have been in need of assistance.

¶ 34    Indeed, absolute certitude is not required before a police officer is authorized to conduct a search under circumstances such as those existing in this case. Notably, the law is well settled that probable cause does not require a showing that it is more likely than not that a crime occurred. See, *e.g.*, *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009). Thus, we hold that, where, as here, the police have a reasonable basis to believe that someone else in a residence might be in need of assistance, the community-caretaking doctrine authorizes the limited sort of intrusion that was made in this case.

¶ 35    Moreover, although the police here were aware of some facts that weighed against an inference that someone else might have needed assistance inside the residence, that does not compel a different result. In *People v. Jones*, 215 Ill. 2d 261, 278 (2005), our supreme court found that an officer had probable cause to believe that an object was drug paraphernalia even though his belief "was not absolutely guaranteed to be correct." The court explained, " 'Because many situations which confront officers in the course of executing their duties are

more or less ambiguous, room must be allowed for some mistakes on their part.' " *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). Here, though some facts weighed against inferring that someone else in the home was in need of assistance, the police still had the photograph of the unidentified subject dressed in a manner different from defendant. Thus, the situation was ambiguous. Under such circumstances, it was entirely reasonable to conduct a limited sweep of the residence to ascertain if someone else was in need of assistance.

¶ 36 We find unpersuasive defendant's attempt to characterize the officers' actions as being based on a mere hunch. A mere hunch is, of course, insufficient to justify an intrusion into an interest protected by the fourth amendment. *People v. Slaymaker*, 2015 IL App (2d) 130528, ¶ 14. However, here, the picture of the unidentified subject holding a knife, along with defendant's refusal to admit that he was that subject, provided the officers with an articulable basis for their concern that someone within the residence might have needed assistance.

¶ 37 In sum, we conclude that the officers' entry into defendant's home to check for other occupants in need of assistance was reasonable under the circumstances and did not offend the fourth amendment.

¶ 38                              B. OTHER ISSUES

¶ 39 As we have determined that the officers' entry into defendant's home and limited search therein were lawful in accordance with the community-caretaking doctrine, we also determine that they were entitled to be in defendant's residence when they observed the cannabis plants in plain view. Moreover, the trial court also found that the officers were acting in good-faith reliance on a warrant, which they obtained after their initial entry, when they seized the cannabis plants. As we have determined that the officers' actions were lawful, the question of good faith is moot. Finally, as we have found that the community-caretaking doctrine justified the officers' actions, we need not consider the applicability of the emergency-aid exception to the warrant requirement.

¶ 40                              III. CONCLUSION

¶ 41 In light of the foregoing, the judgment of the circuit court of Lake County is affirmed.

¶ 42 Affirmed.