2022 IL App (2d) 180787-B-U
No. 2-18-0787
Order filed June 6, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CF-1774 |
| | ) | |
| DMITRY KOLESNIKOV, | ) ) | Honorable James K. Booras, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

ORDER

¶ 1    *Held*:  Police officers' entry into defendant's residence was justified under the emergency exception to the warrant requirement as a result of a suicide threat emanating from defendant's computer, where a photograph of a torso of an unidentified individual with a large knife on his lap accompanied threat, and defendant would not identify the individual in the photograph.

¶ 2    Defendant, Dmitry Kolesnikov, was convicted of unlawful possession of cannabis (720 ILCS 550/5(f) (West 2016)). The trial court imposed a three-year sentence. The trial court determined that police officers' entry into defendant's home was justified in accordance with the community-caretaking doctrine and that they were lawfully inside defendant's premises when they observed cannabis plants in plain sight. Defendant previously appealed, and, we affirmed, holding that the community-caretaking doctrine authorized the entry into defendant's residence.

Defendant sought review in the supreme court. Subsequent to the issuance of our disposition, the United States Supreme Court issued its decision in *Caniglia v. Strom*, 593 U.S. ___, 141 S. Ct. 1596 (2021). In that case, it held that the community-caretaking doctrine does not apply to searches of residences. Accordingly, our supreme court, in an exercise of its supervisory authority, directed us to vacate our earlier judgment in this matter and reconsider in light of *Caniglia*. We now vacate our earlier judgment. The parties were allowed to submit supplemental briefing on this issue. Having reconsidered these issues, we now affirm.

¶ 3                                    I. BACKGROUND[1]

¶ 4      On June 27, 2017, at about 8 a.m., police were dispatched to defendant's residence. Defendant's ex-girlfriend had made a 911 call and indicated that defendant was suicidal. Two officers arrived and made contact with defendant outside of the residence. Subsequently, they entered and observed cannabis plants in plain view. They then obtained a warrant and seized the plants. Defendant moved to suppress, challenging the officers' entry into the house. A hearing was held on defendant's motion.

¶ 5      Officer Ken Berryhill of the Vernon Hills Police Department testified first at the hearing. He stated that he was dispatched to defendant's home along with Officer Rebecca Foy. They arrived in separate cars at about 8 a.m. Both officers were in uniform. Berryhill testified that they were "dispatched to a possible suicidal subject where the complainant was an ex-girlfriend of the subject." The complainant "had received some emails from [defendant's] account stating that he

---

[1] The following section first appeared in our original disposition in this case, *People v. Kolesnikov*, 2020 IL App (2d) 180787 (*Kolesnikov I*); it is reproduced here for the convenience of the reader.

wished to commit suicide and left [*sic*] a picture of a knife." Berryhill was informed that defendant was the subject. A driver's license photograph of defendant was sent to Berryhill.

¶ 6 Berryhill and Foy approached the front door of defendant's residence (defendant lived in a townhouse). They knocked or rang, and defendant answered the door. Defendant was wearing a bathrobe. He had no shirt on, and Berryhill could not tell if he was wearing shorts. They spoke with defendant, who "appeared intoxicated; slow, sluggish, groggy." They asked if they could come in, and defendant said that they could not. They told defendant that they needed to speak with him, and defendant stepped outside. Defendant responded to the officers' questions "[v]aguely." He told the officers who he was and acknowledged knowing the complainant, but he did not say "much above and beyond that." When asked about the e-mails the complainant had received, defendant "appeared confused" and "[d]idn't answer either yes or no." Defendant stated that he had been drinking and had just woken up. Berryhill could observe no physical injuries, but noted that defendant's bathrobe had long sleeves.

¶ 7 An ambulance had also been dispatched to the scene. While the officers were speaking with defendant, Foy received a text message containing the picture defendant had sent to his ex-girlfriend. The image showed the "crotch area" of a person wearing jeans sitting in what appeared to be water, with a large knife on his lap. Foy showed defendant the image and asked if he had sent it. Defendant would not answer "yes or no" and seemed confused. They told defendant that they wanted to get him checked out because "he just wasn't acting appropriately." Defendant was not wearing jeans when the officers spoke with him, and he did not appear wet. They took defendant to the ambulance. The officers were "[c]oncerned that possibly there might be someone hurt inside the house." They thought that possibly the subject in the picture was not defendant. Berryhill added, "We [were] not really sure what's—has gone on in this house."

¶ 8      Accordingly, they decided to enter the house "[t]o see if there was a person that's still sitting in a bathtub with a knife in their lap." They "weren't sure what exactly was going on." Berryhill explained that defendant "was not being very forthcoming as far as that he had sent these images or even that it was him." The officers had "no intent to look for any sort of contraband." They did not look in any drawers or cabinets but looked merely "in rooms for human beings." They quickly checked the first floor and then Berryhill went downstairs to the basement. Berryhill noted a light shining through a partially open door. He opened the door fully and observed marijuana plants growing out of buckets. Berryhill went back upstairs and told Foy what he had found. They then checked the rest of the residence for people. They heard a toilet flush, and a man came out of a bathroom (the man is a codefendant who is not involved in this appeal). They placed him under arrest. After completing their sweep of the house, they secured it and sought a warrant.

¶ 9      On cross-examination by counsel for the codefendant, Berryhill testified that his dispatch to defendant's residence would not have terminated when they secured defendant in the ambulance regardless of whether he had discovered the cannabis. He explained that the fact that they could not identify the person in the photograph with the knife on his lap, along with defendant's evasiveness, raised a concern that someone else might be in need of assistance in the house. Berryhill acknowledged that ambulance personnel rolled defendant's sleeve up, which revealed injuries to defendant's arm. He further agreed that when he first made contact with defendant, defendant was not wearing jeans and was not wet. Defendant told Berryhill that he had just woken up. Berryhill testified that no one had told him that someone else might be in the house. In fact, defendant had stated that there was no one else in the house. However, Berryhill explained, he was not sure whether to believe defendant, as defendant had appeared evasive in response to their

questions. Berryhill acknowledged that he entered the house after he had identified defendant as the person they were looking for and observed in the ambulance injuries on defendant that were consistent with an attempted suicide.

¶ 10    On cross-examination by defendant's attorney, Berryhill acknowledged that, although he had not previously been to defendant's residence, he had been to other similar residences in the housing complex, so he was familiar with their layout. He denied knowing that bathrooms were on the second floor. When dispatch first communicated with Berryhill, it was related that there had been a report of a suicidal individual named Dmitry called in by the subject's ex-girlfriend, who had received an e-mail from the subject threatening suicide. The e-mail was in Russian. The message from dispatch did not express any concerns about anybody besides defendant. Foy was texted a photograph of defendant. When they first encountered defendant at the front door, Foy did most of the talking. Defendant was calm, albeit sluggish and apparently intoxicated. He was not aggressive, made no furtive movements, and did not attempt to evade or disengage from the officers. Based on the photograph that had been texted to Foy, the officers determined that the man at the door was the subject of the suicide threat. Defendant denied their request to enter the residence. They asked defendant to step out of the house, and he complied. They spoke with defendant for about 5 to 10 minutes before they brought him to the ambulance. Berryhill testified that defendant's behavior was not unusual, "[o]ther than he was unable to explain why these images were sent; whether he even sent them; or anything like that; you know, there was offered no explanation for what we were there to talk to him about." They heard no sounds coming from the house and did not speak with any of the neighbors. A couple other officers arrived while Berryhill and Foy spoke with defendant.

¶ 11    When asked whether he was concerned that someone else might be in need of assistance inside the house, Berryhill stated:

> "During our conversations with him; and the fact that he was not making admissions to that—to even sending those emails; we weren't sure exactly what was going on at that point; whether he was the person depicted in that or not. And we started having concerns that maybe there is someone else in the house at that point."

At the ambulance, Berryhill observed several small cuts on defendant's left forearm, which he described as "superficial." There was little or no bleeding. Berryhill agreed that this confirmed that defendant was the subject of the call made by defendant's ex-girlfriend.

¶ 12    Berryhill agreed that they did not rush into the house after leaving defendant at the ambulance. When asked whether he had any information that would have led him to believe that there was someone else in the house, Berryhill replied, "We had the photograph that we weren't sure was Dmitry." They made a warrantless entry of the house. Defendant was not under arrest. Berryhill testified that he was not concerned about the knife. He agreed that defendant's residence was similar to other residences in the complex in which he had previously been. Berryhill stated that he did not know where the bathtub was in these units, as he had primarily been in the front living area in the past.

¶ 13    On recross by the codefendant's attorney, Berryhill testified that defendant was able to identify himself when Berryhill first made contact with him. Before Berryhill entered defendant's residence, he was aware of the content of the e-mail threatening suicide. However, though it came from defendant's e-mail account, defendant did not acknowledge sending it and in fact denied doing so; hence, Berryhill was not certain who actually sent it. When Berryhill first entered defendant's residence, he passed through the living room, entered the kitchen, and then went

downstairs to the basement. He acknowledged that there was a staircase leading to the second floor in the living room and that he bypassed it to go to the kitchen. The only bathtub in the residence was on the second floor. Berryhill agreed that he was looking for someone sitting in a bathtub.

¶ 14    The parties stipulated that the information garnered by Berryhill and Foy provided the sole basis for the warrant pursuant to which the cannabis plants were seized. They further stipulated that the plants were, in fact, seized.

¶ 15    Foy testified next for the State. She stated that, on June 27, 2017, she was dispatched to a location regarding a suicidal subject. She was in uniform and driving a squad car. She had been informed that the ex-girlfriend of the subject had received an e-mail in Russian stating that he was going to harm himself. Berryhill arrived at approximately the same time Foy did. Foy had been provided with a picture of defendant. Dispatch also sent Foy a copy of the actual e-mail received by defendant's ex-girlfriend, which included a photograph of the "torso" or "crotch area" of a person, with a hand and a large knife visible. The person was wearing jeans, which appeared to be wet. The person seemed to be sitting in a bathtub or in "[s]ome sort of water."

¶ 16    Foy and Berryhill approached defendant's door and knocked. Defendant answered. He was wearing a bathrobe, which was dry. Defendant "appeared to be extremely intoxicated, very evasive, [and] did not want to give a lot of information." Foy asked if they could come in, and defendant declined. She told defendant why they were there. Foy asked defendant about the photograph, and "he did not confirm nor deny but really didn't have much to say to us." She could not tell if defendant had been injured. Eventually, they called the ambulance, which had been "staging" down the street, forward. They took defendant to the ambulance.

¶ 17    At that point, Foy testified, they "decided to go in and do a protective sweep of the house just to make sure there was nobody hurt inside because we could not confirm that he was the one in the picture." Foy testified that they were concerned that "there could be someone hurt inside." Her concerns were based on the photograph of the person with the knife. They entered and proceeded through the living area to the kitchen. Foy remained in the kitchen while two other officers went downstairs. Subsequently, she and Berryhill went upstairs, where they encountered and arrested the codefendant, after which she checked the rest of the upstairs.

¶ 18    On cross-examination by defendant's attorney, Foy testified that, although they were aware that the e-mail threatening suicide came from defendant's e-mail address, they were not certain that defendant had sent it. She acknowledged that dispatch related to her that defendant was the suicidal individual. As she approached defendant's door, she did not hear any "yelling or screaming from the house." When defendant answered the door, Foy was able to identify him from his driver's license photograph. After defendant stepped out of his residence, they spoke with him for about four or five minutes on his front porch. Foy agreed that they did not rush into the residence as soon as defendant was taken to the ambulance. They entered the house to determine if there were any additional victims.

¶ 19    On cross-examination by the codefendant's counsel, Foy reiterated that they did not know whether defendant was the person in the photograph with the knife. She was asked, "And because you did not know, you decided it was a good idea to just check the house?" Foy replied, "For additional victims, absolutely."

¶ 20    The trial court then ruled on defendants' motion to suppress the evidence. The court began its discussion by reviewing the testimony on why the officers entered defendant's residence. It first noted that the police "had no suspicion" and were not investigating a crime when they came

2022 IL App (2d) 180787-B-U

to defendant's residence. Rather, they were there to check on the well-being of a suicidal person. They knocked and defendant answered the door in "a drunken state." Defendant did not provide the officers with any information regarding the issue for which they were dispatched. The trial court found, "Since they were not getting too many answers from the defendant, they had no idea if there was anyone else left in the house." The trial court continued, "They didn't know what had happened in the house, what precipitated their call there." Moreover, "They were not clear other than having that email and the defendant's suicidal communication including the picture with the knife." The trial court further observed that, after defendant was transported away in the ambulance, the officers had to secure the house. In the course of so doing, they needed to make sure that no one else, including possibly children, was left inside. Thus, the officers were acting "in a reasonable way to discharge their community-caretaking duties."

¶ 21    The trial court then found that, in the course of checking the house, the officers discovered the cannabis in plain view. The trial court also found that the officers were acting in good-faith reliance on the warrant when they seized the cannabis plants. It then denied defendant's motion to suppress. Defendant filed a motion to reconsider. The trial court denied this motion, explaining that the officers were acting in furtherance of their community-caretaking duties. They needed to ascertain whether there were additional victims in the house. The court reiterated its concern that there could have been children in the house and that the officers needed to see if this were so prior to securing the residence.

¶ 22    Thereafter, the trial court held a bench trial on the stipulated evidence. The parties also agreed to a three-year sentence of imprisonment should defendant be convicted. The State recited the evidence to which the parties stipulated. It then nol-prossed count VII (possession of a controlled substance). The trial court convicted defendant of count II (possession of cannabis) and

sentenced him to the three-year sentence previously agreed upon. The trial court denied defendant's motion for a new trial, and this appeal followed. We affirmed; however, the supreme court vacated our earlier judgment and directed we reconsider our decision in light of *Caniglia*, 593 U.S. ___, 141 S. Ct. 1596.

¶ 23                                    II. ANALYSIS

¶ 24     On remand, the parties present us with two main arguments. In light of *Caniglia*, the rationale of our initial disposition in this matter is no longer tenable; however, the question remains as to whether the officers' entry into defendant's residence under the circumstances of this case was justified in some other manner, such as the emergency exception to the warrant requirement (see *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 29). If no such justification permitted the entry, the plain-view exception would not apply in this case, as the officers would not have been in a place they were entitled to be when they observed the cannabis. Alternatively, the State contends that if the entry was not authorized under the emergency exception, suppression is not the appropriate remedy, as the officers had a good-faith belief based on existing case law that the entry was justified (see *People v. LeFlore*, 2015 IL 116799, ¶ 18). As we conclude that the entry in the case was justified pursuant to the emergency exception, we have no occasion to consider the State's alternative argument.

¶ 25     When reviewing a trial court's decision on a motion to suppress evidence, a court of review is presented with a mixed question of law and fact. *People v. McQuown*, 407 Ill. App. 3d 1138, 1143 (2011). Questions of historical fact are reviewed using the manifest-weight standard. *Id.* As such, they will be reversed only if an opposite conclusion is clearly apparent. *People v. Colquitt*, 2013 IL App (1st) 121138, ¶ 28. However, the ultimate question of whether suppression is warranted is reviewed *de novo*. *Id.* ¶ 29.

¶ 26    We also note that absolute certitude is not required before a police officer is authorized to conduct a search.  It is well settled that probable cause does not require a showing that it is more likely than not that a crime occurred.  See, *e.g.*, *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009).  Accordingly, where there is a reasonable basis to believe that someone inside a residence needs assistance, the emergency exception authorizes a limited search.  See *People v. Ferral*, 397 Ill. App. 3d 697, 704 (2009).  We now turn to the question of whether the emergency exception to the warrant requirement justified the officers' entry into defendant's residence under the facts and circumstances of this case.

¶ 27    An entry is warranted in accordance with the emergency exception if the police have "a reasonable belief that immediate action is necessary for the purpose of providing aid to persons or property in need thereof."  *Ferral*, 397 Ill. App. 3d at 704.  The exception applies when the following two elements exist: "(1) [the police] have reasonable grounds to believe that an emergency is at hand and that their immediate aid is necessary to assist in the protection of life or property and (2) there is a reasonable basis for connecting that emergency with the residence." *People v. Borders*, 2020 IL App (2d) 180324, ¶ 36.  Whether there is a reasonable basis to believe that an emergency exists is evaluated with reference to the totality of the circumstances of which the officers were aware at the time of the entry.  *Id*.

¶ 28    In our original disposition, in assessing whether the community-caretaker doctrine justified the entry at issue in this case, we made the following observations, which are also pertinent here:

"Initially, we must consider the trial court's findings of historical fact, to which we owe deference.  *McQuown*, 407 Ill. App. 3d at 1143.  While this is a relatively straightforward case and the facts are largely undisputed, we note several findings that have significant relevance here.  The trial court found that the police did not intend to 'investigate either a

crime or to merely snoop around on suspicion that there may be a crime.' When defendant answered the door, he was intoxicated. Further, '[h]e was not providing information regarding the reason why [the police] were called there.' Since they were not getting any information from defendant, 'they had no idea if anyone else [was] left in the house' and '[t]hey did not know if there was a victim in the house.' We cannot say, and defendant does not contend, that these findings are against the manifest weight of the evidence."

*Kolesnikov I*, 2020 IL App (2d) 180787, ¶ 27.

These findings are equally pertinent to our analysis of the applicability of the emergency exception.

¶ 29    The first prong of the emergency-exception analysis requires us to determine if the facts known to the police provided a reasonable basis for concluding that an emergency may have existed and that someone was in need of assistance. *Borders*, 2020 IL App (2d) 180324, ¶ 36. We conclude that they did. A suicide threat was made via an e-mail account belonging to defendant. The message purported to be from defendant; however, defendant was evasive when asked about it. The e-mail included a photograph showing the torso of a person with a large knife. The identity of the person in the photograph could not be readily discerned. The photograph showed a person who was wearing jeans and was wet. Conversely, when the officers encountered him, defendant was wearing a robe and was dry. The officers asked defendant whether he was the person in the photograph. Defendant would not answer yes or no. Ample evidence allowed for a reasonable belief that an emergency existed.

¶ 30    Further, the second prong of the analysis is satisfied as well. This prong requires that there was a "reasonable basis for connecting [the] emergency with the residence." *Borders*, 2020 IL App (2d) 180324, ¶ 36. Defendant's ex-girlfriend informed the police that she had received a suicide threat, via email, from an account owned by defendant. The suicide threat was

communicated using defendant's computer, thus providing a link to defendant's residence. It was reasonable, therefore, to believe that an emergency existed in defendant's home.

¶ 31 Also relevant to the reasonableness of the officers' conduct was the limited scope of the search they conducted. See *People v. Ramsey*, 2017 IL App (1st) 160977, ¶ 25. They simply swept the residence looking for other individuals. The officers did not search drawers or cabinets, where only small objects could be concealed.

¶ 32 In sum, we conclude that the officers' entry into defendant's residence was justified under the emergency exception to the warrant requirement.

¶ 33 Defendant attempts to avoid this result, arguing that any basis to conclude that an emergency existed was dispelled when the officers made contact with defendant, took him to the ambulance, and observed shallow cuts on his arm. Defendant asserts that there was no indication that anyone else was in the residence. However, the threat came from the house, and a picture showed an unidentified individual with a large knife on his lap. Notably, the trial court found that defendant was not answering the officers' questions about why they were dispatched there. That it was not possible to identify the person in the picture of the individual with the knife supports the application of the emergency exception here. At most, defendant has identified some conflicting evidence that would allow an inference contrary to that drawn by the trial court. However, given the deferential standard of review we apply to the trial court's findings of historical fact (see *McQuown*, 407 Ill. App. 3d at 1143), we cannot say that an opposite conclusion to the trial court's is clearly apparent here.

¶ 34 Defendant relies on *People v. Koester*, 341 Ill. App. 3d 870 (2003), in arguing for a contrary result. In that case, the police received a 911 call from a female caller, who hung up before speaking with a dispatcher. The responding officer testified that such hang-ups are treated as

emergencies, as the caller could have been coerced into not completing the call. When the officer arrived at the residence from which the call was placed, it appeared that a party was taking place. The officer knocked, and an occupant answered. The occupant initially stated that the 911 call did not originate from the residence; however, he subsequently stated that his sister may have placed the call. He also stated that "everything was fine." The occupant denied the officer's request to enter. The officer's supervisor arrived, and they consulted with a state's attorney. After about half an hour, they decided exigent circumstances existed and entered the residence. They told the occupant that they were going to enter the home to determine whether police or medical assistance was needed. However, the responding officer admitted that he only brought a portable breathalyzer with him when he entered, rather than a first-aid kit. They located other occupants, and noted an odor of alcohol emanating from them. Several were charged with consuming alcohol while under the age of 21. The defendants moved to suppress.

¶ 35    The trial court granted the motion, and the reviewing court affirmed, holding that the trial court's decision was not contrary to the manifest weight of the evidence. *Koester*, 341 Ill. App. 3d at 875. This is significant, as here, unlike *Koester*, defendant had not prevailed in the trial court and thus bore the burden of overcoming the deferential standard of review. Defendant points out that, as in *Koester*, the delay by the police in entering the residence weighed against finding an emergency existed. We agree; however, we do not find that sufficient to outweigh the photograph of the unidentified individual with the knife and defendant's general evasiveness. *Id*. Indeed, we note that, unlike defendant, the occupant of the residence in *Koester* reassured the police that "everything was fine." *Id*. While *Koester* bears some similarities to this case, the differences render it readily distinguishable.

¶ 36    Defendant also cites *People v. Ovieda*, 7 Cal. 5th 1034 (2019), however, that case is distinguishable as well.   In it, the State "elicited no testimony to show the officers reasonably believed" an emergency existed.   Here, we have the photograph of the unidentified person and defendant's failure to state whether he was the individual in the photograph.  Thus, unlike *Ovieda*, the officers in this case had a basis to believe that an emergency existed.

¶ 37    In light of the information known to the officers at the time of the entry and given the limited nature of their search, the officers' conduct was objectively reasonable and authorized in accordance with the emergency exception to the warrant requirement.  As we have determined that the officers' entry into defendant's home was justified by the emergency exception, we further hold that they were entitled to be in defendant's residence when they observed the cannabis plants in plain view.

¶ 38                                    IV. CONCLUSION

¶ 39    Accordingly, the judgment of the circuit court of Lake County is affirmed.

¶ 40    Affirmed.